**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CITY OF PONTIAC POLICE AND FIRE RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SOLENO THERAPEUTICS, INC., ANISH BHATNAGAR, JAMES MACKANESS, and MEREDITH MANNING,<br><br>Defendants. | Case No. 3:26-cv-01979-EMC<br><br><u>CLASS ACTION</u><br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ..... 1

II. JURISDICTION AND VENUE ..... 9

III. THE EXCHANGE ACT PARTIES ..... 10

A. Lead Plaintiff ..... 10

B. Defendants ..... 10

IV. SOLENO'S SCHEME AND COURSE OF CONDUCT ..... 12

A. Soleno's Survival Depended Entirely On Vykat, And Its Initial Phase 3 Trials Failed ..... 12

B. The FDA Approved Vykat Despite Significant Reservations About The Efficacy Evidence, Invoking "Regulatory Flexibility" In Light Of The Rare-Disease Context And Lack Of Approved Treatments ..... 13

C. The Class Period Begins: Defendants Announce FDA Approval Of Vykat, Touting Its "Well-Established Safety Profile" And "Robust And Durable Clinical Data" Showing That Vykat "Significantly Impacts Hyperphagia" ..... 15

D. Defendants Immediately Begin Cashing Out Of Soleno, Selling Tens Of Millions Of Dollars Of Stock While Secretly Exploring A Sale Of The Company ..... 16

E. Following Vykat's Launch, Defendants Continue To Tout Its Efficacy, Safety, And Demand—And Then Raise $230 Million From Investors ..... 18

F. Defendants Assure Investors That Vykat Has "Extraordinary Momentum" And "No New Safety Signals" ..... 20

G. Nine Days Later, The Scorpion Capital Report Begins To Expose The Efficacy, Safety, And Commercial Viability Problems Defendants Had Concealed From Investors ..... 21

1. The Scorpion Report Undermined Defendants' Claims That Vykat's Efficacy Was "Established" ..... 22

2. The Scorpion Report Revealed Serious Safety Problems That Defendants Had Minimized During The Trials—And That Began Reemerging In Commercial Patients ..... 30

3. The Scorpion Report Revealed That The Same Efficacy And Safety Problems Materially Undermined Vykat's Commercial Prospects ..... 37

H. Defendants Deny The Scorpion Report And Continue To Reassure Investors About Vykat's Safety And Patient Persistence ..... 38

**Page**


I. Defendants Admit That Significant Safety Concerns Have Materially Disrupted Vykat's Launch ....40

J. Post-Class-Period Developments Confirm The Efficacy, Safety, And Commercial Problems Soleno Faced During The Class Period ....42

1. Vykat's Commercial Performance Continues To Deteriorate, Soleno Is Ultimately Sold At A Deep Discount, And Neurocrine's Own Due Diligence Assumed Far Greater Patient Attrition ....42

2. After Reviewing The Same Core Clinical Evidence That Defendants Publicly Touted During The Class Period, The European Medicines Agency Concluded That Vykat Could Not Be Authorized In Europe ....44

3. Leading PWS Experts Publicly Warn About The Same Safety Problems Scorpion Had Exposed, And A Prominent Critic Concedes Scorpion Was Right ....46

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....48

A. March 26, 2025 Press Release and Special Call ....49

B. Q1 2025 Earnings Release And Conference Call ....54

C. June 4, 2025 Jefferies Healthcare Conference ....55

D. June 10, 2025 Goldman Sachs Global Healthcare Conference ....59

E. Q2 2025 Earnings Release And Conference Call ....61

F. August 21, 2025 Statements To STAT News ....63

G. September 3, 2025 Cantor Global Healthcare Conference ....65

H. September 10, 2025 Press Release Responding To A Reported Patient Death ....66

VI. ADDITIONAL ALLEGATIONS OF SCIENTER – EXCHANGE ACT CLAIMS ONLY ....67

VII. LOSS CAUSATION—EXCHANGE ACT CLAIMS ONLY ....73

VIII. PRESUMPTION OF RELIANCE—EXCHANGE ACT CLAIMS ONLY ....75

IX. DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT ....77

A. The Securities Act Parties ....77

**Page**

B. Soleno's SPO Offering Documents ........ 78

C. Soleno's Materially Untrue And Misleading Statements In The Offering Documents And SEC Filing Incorporated By Reference ........ 78

D. The Offering Documents Failed To Disclose Known Trends And Uncertainties Required By Item 303 Of Regulation S-K ........ 82

X. CLASS ACTION ALLEGATIONS ........ 84

XI. UNDISCLOSED ADVERSE INFORMATION—EXCHANGE ACT CLAIMS ONLY ........ 86

XII. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 87

XIII. COUNTS AGAINST DEFENDANTS ........ 88

COUNT I ........ 88

For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants) ........ 88

COUNT II ........ 91

For Violations of §20(a) of the Exchange Act (Against the Individual Defendants) ........ 91

COUNT III ........ 92

For Violations of §11 of the Securities Act (Against The Securities Act Defendants) ........ 92

COUNT IV ........ 93

For Violations of §12(a)(2) of the Securities Act (Against The Securities Act Defendants) ........ 93

COUNT V ........ 95

For Violations of §15 of the Securities Act (Against The Securities Act Defendants) ........ 95

XIV. PRAYER FOR RELIEF ........ 96

XV. JURY DEMAND ........ 96

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiff" or "Plaintiff"), by and through the undersigned counsel, alleges the following upon information and belief, except as to allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Plaintiff brings this federal securities class action on behalf of all purchasers of Soleno Therapeutics, Inc. ("Soleno" or the "Company") common stock between March 27, 2025 and November 4, 2025, inclusive (the "Class Period"), against Soleno and certain of its officers seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").

Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Soleno with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of shareholder communications, conference calls, and postings on Soleno's website concerning the Company's public statements; (d) review of relevant scientific publications; (e) review of materials published or maintained by relevant regulators (including the U.S. Food and Drug Administration ("FDA") and European Medicines Agency); (f) review of news and other media reports concerning Soleno, including the Scorpion Report (defined below); and (g) review of other publicly available information concerning the Company and the Individual Defendants (defined below).

## I. PRELIMINARY STATEMENT

1. This is a securities class action against Soleno and its senior executives. Soleno was a pharmaceutical company whose business depended entirely on the success of a single drug: VYKAT XR ("Vykat"). Vykat cost nearly $500,000 per patient per year and was intended to treat hyperphagia—the insatiable and chronic hunger experienced by patients with the rare genetic disorder Prader-Willi syndrome ("PWS"). Vykat was Soleno's only commercial product and the sole source of its revenue. Accordingly, Soleno's financial condition and business prospects depended entirely on whether Vykat was effective, safe, and commercially successful.

2. On March 26, 2025, the FDA approved Vykat. Significantly, however, approval occurred only after Soleno's conventional Phase 3 trial had failed its primary efficacy endpoint, and the Company instead relied on a later withdrawal study of patients who had already taken Vykat for years. As the FDA itself made clear to Soleno, approval did not mean that the FDA regarded Vykat's efficacy and safety evidence as free from substantial concern. To the contrary, the agency believed the failed trial "create[d] uncertainty about the treatment effect," invoked "regulatory flexibility" in approving Vykat because of the rare-disease context and lack of approved treatment, and required enhanced post-approval surveillance for the drug. The detailed FDA review materials containing those concerns were not made public until April 27, 2026—nearly six months after the Class Period ended.

3. Yet when Soleno announced the FDA's approval after the close of trading on March 26, 2025, Defendants presented investors with a markedly more reassuring picture. Defendants represented that Vykat's efficacy had been "***established***" in a "***multi-center, randomized, double-blind, placebo-controlled trial***," and touted the supporting clinical evidence as a "***comprehensive data package***." Moreover, Defendants emphasized the drug's "***well-established safety profile with over four years of data***" and a "***favorable safety and tolerability profile***." Defendants also emphasized that Vykat's addressable market consisted of approximately 10,000 patients and that roughly 80% of surveyed pediatric endocrinologists were willing to prescribe the drug, presenting Vykat as both clinically proven and poised for rapid commercial adoption.

4. Fueled by Defendants' wholly positive statements, Soleno's stock price skyrocketed approximately 38% on the next trading day, March 27, 2025, closing at $67.39 per share. Analysts celebrated Defendants' portrayal of Vykat, uniformly raising their price targets for the Company while citing the drug's "***very strong clinical data***" and the resulting "***blockbuster opportunity***" that it represented.

5. Defendants immediately capitalized. On March 27, the very next day after Vykat's approval, Soleno's senior executives—Defendants Bhatnagar, Mackaness, and Manning—exercised options to acquire 630,809 shares of Soleno stock and sold ***every one of those shares*** on the open market for approximately ***$42.7 million*** in proceeds in a single day. Bhatnagar alone sold

523,809 shares—representing ***more than 40%*** of his shares available for sale—for approximately $35.3 million. The timing was extraordinary: none of the sales were made pursuant to a Rule 10b5-1 trading plan, and none of the Individual Defendants had sold a single discretionary open-market share during the comparable control period. Nor were they under any time pressure to sell—the options did not expire for years. Thus, immediately after Defendants' representations sent Soleno's stock soaring, they exercised long-dated options and sold every share acquired, realizing tens of millions of dollars in cash.

6. The March 27 sales were not the only avenue through which Defendants stood to monetize their interests in Soleno. Within days of Vykat's approval, Soleno was already engaged in a confidential process exploring a sale of the entire Company—an all-cash transaction that would enable the Individual Defendants to monetize the equity interests they still retained while also triggering millions of dollars in change-in-control payments. Tellingly, multiple prospective acquirers later walked away after conducting due diligence on Soleno and Vykat.

7. In the months that followed, Defendants continued to make uniformly positive statements about Vykat's efficacy, safety, and commercial demand. On May 7, 2025, after only 29 business days of launch, Soleno touted 268 patient start forms—physician submissions initiating the process for patients to obtain Vykat—from 131 prescribers, describing a "high level of interest," a "significant unmet need," and a launch "well positioned to sustain current momentum." On June 4, Bhatnagar described Vykat's randomized withdrawal study as "***about as convincing an evidence of efficacy as you would expect to see***," explaining: "***You give the drug, there's an effect. You take the drug away, the effect goes away. You give the drug back, the effect comes back***," leaving "***very little argument that this is a drug that really does work.***" He likewise characterized Vykat's safety profile as comparatively benign, with common adverse events "***typically grade 1/2***" and "***typically self-limiting***." Days later, Mackaness emphasized Soleno's "***extensive clinical trial safety database***" and reiterated that Vykat represented a U.S. commercial opportunity exceeding ***$2 billion***.

8. Within weeks, those representations propelled Soleno's stock to record levels, reaching a Class Period high of $88.49 on July 9, 2025. The very next day, the Company priced a

secondary public offering ("SPO") of 2,352,941 shares at $85 per share, and the underwriters subsequently exercised their option to purchase an additional 352,941 shares. In total, Soleno sold 2,705,882 shares to investors in the SPO for approximately ***$230 million in gross proceeds***. Thus, only months after the Individual Defendants had personally realized approximately $42.7 million from their own stock sales, Soleno itself capitalized on the elevated share price by raising another $230 million from public investors.

9. Defendants continued their assurances through August. On August 6, 2025, Soleno reported second-quarter results and touted "***extraordinary momentum***" in Vykat's launch. Bhatnagar assured investors that Soleno had "***not seen anything in the post-marketing setting that is different from the clinical trial setting***" and that there were "***no new safety signals***." Bhatnagar also stated that patient discontinuation rates were "***substantially lower than what we saw even in clinical trials***" and that Soleno did not "***expect that to change significantly.***"

10. Just nine days later, on August 15, 2025, Scorpion Capital—a prominent research and short-seller firm—published a 415-page investigative report on Soleno (the "Scorpion Report") that began to reveal a dramatically different picture of Vykat. Scorpion based its conclusions regarding the drug on a months-long investigation and more than 30 interviews with physicians, highly placed former employees, trial investigators, and other individuals possessing direct, firsthand knowledge of the drug. Scorpion further compared those accounts against Soleno's clinical data, published scientific literature, FDA materials, public statements, and contemporaneous reports from PWS patients and caregivers.

11. The Scorpion Report revealed fundamental problems with the clinical evidence Defendants had repeatedly touted as establishing Vykat's efficacy. Throughout the Class Period, Defendants represented that Vykat's efficacy had been "***established***" through a rigorous "***randomized, double-blind, placebo-controlled***" withdrawal study, described the supporting evidence as a "***comprehensive data package***," and later called the study "***about as convincing an evidence of efficacy as you would expect to see***." Double-blinding is a fundamental safeguard of a clinical trial: if patients, caregivers, and investigators know who is on the drug and who is on placebo, the study's results can be compromised. The Scorpion Report revealed that, although

"double-blind" in name, the withdrawal study was functionally unblinded. Vykat produced readily observable side effects—including excess hair growth and edema—and the active drug had a distinctive odor, enabling caregivers and investigators to infer whether patients were receiving Vykat or placebo. Families in the closely connected PWS community also compared those characteristics with one another online. Indeed, a former Soleno employee reported that "***just from the side effects, it's pretty clear whether you're on active drug or not***," and that employees working on the trial had raised the same concern internally at the Company.

12. This fundamental unblinding problem was especially significant because Vykat's reported efficacy depended on a subjective caregiver questionnaire rather than an objective physiological endpoint. Scorpion revealed that trial investigators stated that the questionnaire was manipulated, and that caregivers appeared to know the score necessary to qualify patients for enrollment—one investigator recalled patient after patient arriving with the same conspicuous qualifying score: "***13, 13, 13***." The Report further revealed that enrollment was heavily concentrated among only three investigators, that Soleno restricted investigators' access to underlying patient-level data, and that even Soleno personnel had questioned the unusually rapid and extreme deterioration reported when patients switched to placebo.

13. Strikingly, physicians who actually conducted Soleno's trials told Scorpion that they did not observe the meaningful efficacy Defendants had described to investors. One prominent PWS investigator (and a Soleno study co-author) stated flatly: "***I just didn't think it worked***," adding that he did not see "***$500,000 worth of—or $5,000 worth of benefit***," and would not prescribe the drug. Another investigator who participated across Soleno's clinical program said, "***to be frank, my feeling was I don't think anyone improved***," while another reported that all of his patients eventually stopped Vykat because they "***just didn't see any benefit***." These were not outside critics—they were physicians who had administered Vykat to the very patients whose results Defendants relied upon to tout the drug's efficacy.

14. The Scorpion Report also revealed serious safety problems that directly contradicted Defendants' portrayal of Vykat's clinical safety record. At the beginning of the Class Period, Defendants touted a "***well-established safety profile with over four years of data***" and a

"***favorable safety and tolerability profile***." On June 4, 2025, Bhatnagar characterized Vykat as comparatively benign, stating that the common adverse events were "***typically grade 1/2***" and "***typically self-limiting***," while referring to only "***a couple of serious AEs that are more notable***." In direct contrast to that reassuring picture, Scorpion revealed serious safety problems during the very clinical program Defendants had been touting, and a concerted effort to conceal those problems. Former Soleno personnel described young trial participants being hospitalized for fluid overload and potential heart failure, as well as an internal atmosphere in which adverse events were minimized and investigators were pressured not to attribute them to Vykat. One former employee stated that Soleno had "***very much [] downplay[ed] the adverse effects***," while a trial investigator independently characterized Soleno's approach as "***play it down, play it down***." Scorpion also reported trial patients developing diabetes and clinically significant hyperglycemia—particularly striking given Soleno's June 25 assurance that Vykat "can be safely administered to individuals with PWS who have pre-diabetes and diabetes."

15. Scorpion further revealed that, notwithstanding Bhatnagar's August 6 assurance that Soleno had "***not seen anything in the post-marketing setting that is different from the clinical trial setting***" and that there were "***no new safety signals***," numerous patients had already experienced severe complications after beginning Vykat—including the same fluid-retention, respiratory, cardiac, and metabolic problems that had occurred during the trials. Caregivers reported patients hospitalized with pulmonary edema and potential heart failure, respiratory failure from fluid overload, severe swelling requiring diuretics, and sharply elevated blood-glucose levels. One caregiver stated that her child's seven-week hospitalization for respiratory failure and fluid overload had been reported to Soleno and the FDA; another reported her five-year-old's respiratory and blood-sugar problems to PANTHERx, the Company's sole specialty pharmacy, just three days before the August 6 statement. Soleno's own field force was also already discussing pulmonary edema, glucose monitoring, and the use of diuretics to manage these issues in Vykat's patients.

16. Those efficacy and safety problems also directly undermined the commercial opportunity Defendants had presented to investors. Scorpion reported that physicians who had administered Vykat were reluctant to prescribe it, patients were discontinuing use because of

limited benefit and adverse effects, and payors were resisting coverage. A former senior Soleno employee estimated that the realistic U.S. market might be only "***10% to 15%***" of PWS patients, while a Vykat trial investigator said even 10% was "[a]t most." Thus, the same undisclosed problems affecting whether Vykat worked and whether patients could tolerate it also threatened whether patients would start—and remain on—the drug.

17. The Scorpion Report immediately sent Soleno's stock down approximately 12%. Defendants responded by forcefully rejecting the Report and continuing to reassure investors about Vykat's safety. On August 21, Bhatnagar emphasized that Soleno was monitoring "***literally hundreds of patients***" and asserted that the Company had seen no "***surprising or worrisome issues that would warrant FDA action***." The reassurances continued into September. On September 3, Bhatnagar represented that the adverse events Soleno was seeing commercially were "***similar to what we expect from the known side effect profile of the drug***." The next day, he again characterized Vykat's commercial safety experience as "***actually pretty consistent with our clinical trial population***."

18. Less than a week later, on September 10, 2025, Soleno filed a Form 8-K with the SEC disclosing that a month earlier, on August 11, a 17-year-old patient on Vykat had died—long before Bhatnagar made his reassuring statements to investors regarding the safety profile of Vykat on August 21 and September 3. In response, Soleno's stock fell approximately 19% over the next two trading days. Nonetheless, in the September 10 Form 8-K, Soleno again defended the drug, declaring that "***VYKAT XR has a proven safety and efficacy profile***." At the same time, the Company announced that it would generally stop publicly commenting on adverse-event reports, including deaths, unless Soleno determined that the event was both directly related to Vykat and unexpected under the prescribing information.

19. The truth emerged on November 4, 2025, when Soleno reported third-quarter results and acknowledged that the safety concerns raised by Scorpion had materially disrupted Vykat's launch. Soleno disclosed that approximately 8% of patients had discontinued because of adverse events, and that total discontinuations had reached approximately 10%. Bhatnagar identified ***peripheral edema and hyperglycemia***—the same fluid-retention and metabolic

problems highlighted by Scorpion—as adverse events causing patients to stop treatment. Significantly, Defendants admitted that the Scorpion Report itself was affecting commercial behavior. Bhatnagar acknowledged a "***disruption in our launch trajectory in the wake of a short seller report***," manifested in fewer patients starting treatment and increased discontinuations, and stated that "***a concern [had] been created because of the adverse event profile of the drug***." Analysts likewise questioned whether patients were hesitating to begin treatment because of the "***fear or worry***" generated by the issues raised in the Report.

20. In response, Soleno's stock price plummeted nearly 27% in a single trading day, falling $16.98 from $63.85 to $46.87, wiping out over $900 million in market capitalization.

21. Events after the Class Period further confirmed Plaintiff's allegations. By February 2026, Soleno disclosed that total patient discontinuations had reached approximately 15% and raised its longer-term expectation to approximately 15% to 20%, while continuing to withhold revenue guidance and announcing that it would stop reporting patient-start metrics. In April 2026, Neurocrine Biosciences agreed to acquire Soleno for $53 per share in cash—approximately ***38% below*** the $85 price at which Soleno had sold stock to investors only nine months earlier. After reviewing Soleno's patient data, Neurocrine ultimately expected Vykat discontinuations to reach approximately ***25% to 30%***. The acquisition also completed the Individual Defendants' exit from Soleno, monetizing their remaining equity interests and triggering more than ***$23 million in aggregate change-in-control payments***.

22. Significantly, an independent regulator corroborated the fundamental efficacy problems Scorpion had exposed during the Class Period. Scorpion revealed previously undisclosed facts undermining the reliability of Soleno's purportedly "double-blind" withdrawal study that Defendants had repeatedly touted as proving Vykat worked, including: the study was effectively unblinded because Vykat's side effects and distinctive odor allowed treatment assignment to be inferred; its efficacy endpoint depended on a subjective caregiver questionnaire that investigators said could be manipulated; Soleno personnel had internally questioned the unusually rapid deterioration reported after patients were switched to placebo; and several of Soleno's own investigators told Scorpion that they did not observe meaningful clinical benefit. When Soleno

later sought approval in Europe based on the same core clinical evidence, the European Medicines Agency ("EMA") independently identified concerns with the withdrawal study's design and concluded that the evidence was "***insufficient to demonstrate the effectiveness of the medicine***" and that Vykat ***could not be authorized in Europe***. Notably, Soleno withdrew its European application after receiving the EMA's assessment.

23. The post-Class-Period safety record was equally striking. In August 2026, three leading international PWS organizations issued an extraordinary joint warning concerning serious adverse events among Vykat patients, signed by seven PWS experts—including ***three investigators who had participated in the very clinical trials used to secure Vykat's approval***. The experts explained that "[t]he intention of this statement is to ***increase awareness of the risks for people with PWS when starting Vykat XR***." By then, seven Vykat patients had died and more than 100 serious adverse events had been reported to the FDA, predominantly involving the same ***swelling, respiratory, and cardiac complications*** Scorpion had identified a year earlier. Notably, the experts rejected the notion that these events could simply be explained by the comorbidities associated with PWS generally, warning that the deaths and complications "***do not appear to be common***" in established PWS registries. Furthermore, the convergence between Scorpion's Class Period findings and the later warnings from leading PWS experts was so striking that even a prominent critic of Scorpion reversed his position. Adam Feuerstein, a senior biotech journalist at STAT, a leading health and life-sciences news publication, had interviewed Defendant Bhatnagar following the Scorpion Report and publicly questioned Scorpion's thesis. After the PWS experts issued their warning, Feuerstein reversed himself: "***Knowing what I know now, I wish I could retract that statement. [Scorpion] was definitely more right about Vykat. I was wrong***."

24. As the truth concerning Vykat's efficacy, safety, and commercial prospects emerged, Soleno investors suffered substantial losses. Plaintiff brings this action to recover the damages caused by Defendants' violations of the federal securities laws.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise (i) under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17

C.F.R. §240.10b-5, and (ii) under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o.

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §27 of the Exchange Act, 15 U.S.C. §78aa, and §22 of the Securities Act, 15 U.S.C. §77v.

27. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b), §27 of the Exchange Act, 15 U.S.C. §78aa, and §22 of the Securities Act, 15 U.S.C. §77v. Substantial acts in furtherance of the alleged conduct or the effects of the conduct have occurred in this judicial district. Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this judicial district as Soleno is headquartered in this District.

28. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. THE EXCHANGE ACT PARTIES

### A. Lead Plaintiff

29. Lead Plaintiff Oklahoma Firefighters Pension and Retirement System is a public pension fund established by the State of Oklahoma in 1981 that provides retirement, disability, and survivor benefits to Oklahoma's paid and volunteer firefighters and their beneficiaries, with more than $3.5 billion in assets under management. As set forth in the Certification filed previously, incorporated by reference herein, Oklahoma Firefighters Pension and Retirement System purchased Soleno common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

30. Defendant Soleno is a pharmaceutical company focused on developing therapies for rare diseases and is headquartered in Redwood City, California. Soleno common stock trades on the NASDAQ stock exchange under the ticker symbol "SLNO."

31. Defendant Anish Bhatnagar ("Bhatnagar") served as the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Soleno during the Class Period.

32. Defendant James (a/k/a Jim) Mackaness ("Mackaness") served as the Chief Financial Officer ("CFO") of Soleno during the Class Period. On February 25, 2026, Soleno announced that CFO Mackaness would be retiring by the end of the Company's first quarter of 2026.

33. Defendant Meredith Manning ("Manning") served as the Chief Commercial Officer ("CCO") of Soleno during the Class Period. Bhatnagar, Mackaness, and Manning are referred to collectively herein as the "Individual Defendants," and, together with Soleno, the "Defendants."

34. During the Class Period, Defendants Bhatnagar, Mackaness, and Manning, as senior executive officers and/or directors of Soleno, were privy to confidential, proprietary, and material adverse non-public information concerning Soleno, its operations, finances, financial condition, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

35. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Soleno's business.

36. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and

presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Soleno's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of the Company's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV. SOLENO'S SCHEME AND COURSE OF CONDUCT

### A. Soleno's Survival Depended Entirely On Vykat, And Its Initial Phase 3 Trials Failed

37. Soleno was a pharmaceutical company whose business depended entirely on the success of a single drug: diazoxide choline extended-release tablets, developed as "DCCR" and later approved and marketed as VYKAT XR ("Vykat"). Vykat was Soleno's only product and its only potential source of commercial revenue.

38. Vykat was developed to treat hyperphagia—an insatiable, chronic sense of hunger—in patients aged four years and older with Prader-Willi syndrome ("PWS"). PWS is a rare genetic neurodevelopmental disorder affecting approximately 300,000 to 400,000 individuals worldwide. Hyperphagia is its hallmark symptom and drives compulsive food-seeking so severe that caregivers may lock cabinets, restrict access to kitchens, and maintain continuous supervision.

39. Before Vykat was approved, Soleno had never commercialized a product, had accumulated a deficit of more than $450 million, and had twice reverse-split its stock to regain compliance with NASDAQ's minimum-bid requirement.

40. Soleno's only conventional Phase 3 efficacy trial for Vykat failed. In that trial, which was conducted between 2018 and 2020 ("Study C601"), patients were randomized to receive Vykat or placebo for thirteen weeks. The study's primary endpoint was a change in hyperphagia measured by the Hyperphagia Questionnaire for Clinical Trials ("HQ-CT"), a nine-item questionnaire completed by each patient's caregiver. Notably, the difference between Vykat and placebo was not statistically significant. In the FDA's words, Vykat "did not separate from placebo on the primary efficacy endpoint." The FDA subsequently advised Soleno that the results of Study C601 were unlikely to support filing a new drug application ("NDA") and requested additional controlled data.

41. Rather than conduct another conventional placebo-controlled trial in newly enrolled patients, Soleno proposed a different approach. Patients who completed Study C601 had been permitted to continue taking Vykat in an open-label extension study, in which every participant knew he or she was receiving the drug and there was no placebo comparison group. By the time Soleno conducted the additional controlled study, the participating patients had been exposed to Vykat for an average of approximately 40 months. Soleno then randomized 77 of those long-treated patients either to remain on Vykat or to switch to placebo for sixteen weeks.

42. Thus, the study tested whether patients who had taken Vykat for years worsened after the drug was withdrawn, rather than whether newly treated patients improved compared with placebo. Caregivers of patients switched to placebo reported worsening hyperphagia on the HQ-CT relative to those who remained on Vykat, producing a statistically significant difference. That randomized withdrawal study became the principal controlled efficacy evidence supporting Soleno's NDA and Vykat's eventual approval.

### B. The FDA Approved Vykat Despite Significant Reservations About The Efficacy Evidence, Invoking "Regulatory Flexibility" In Light Of The Rare-Disease Context And Lack Of Approved Treatments

43. On March 26, 2025, the FDA approved Vykat for the treatment of hyperphagia in

PWS patients four years of age and older. But approval did not mean that the FDA regarded the evidence of Vykat's efficacy as clear or conclusive. Unbeknownst to investors during the Class Period, the FDA's internal review expressed significant reservations about the clinical evidence supporting the drug. Those materials were not made public until April 27, 2026—nearly six months after the end of the Class Period.[1] The FDA wrote that the failure of Soleno's conventional Phase 3 trial "***creates uncertainty about the treatment effect on hyperphagia***." And although the later withdrawal study produced a statistically significant result on its primary measure, neither of its two secondary measures was positive. The FDA also cautioned that the withdrawal study involved a small and varied group of patients and that the apparent benefit in Soleno's trials could have reflected factors other than Vykat itself, including "decreases in environmental restrictions and potential learning effects over the course of extended open-label treatment." The FDA therefore concluded that the withdrawal study required additional evidence confirming that Vykat actually produced the treatment effect.

44. The FDA ultimately found enough confirmatory support in other data from Soleno's earlier clinical program to approve the drug. But even that evidence came with significant qualifications. The agency cautioned that the body-composition and metabolic data Soleno relied upon were not established measures of improvement in hyperphagia, were "***not sufficient to conclude that diazoxide choline leads to clinically meaningful reductions in weight or BMI***," and did not establish precisely how Vykat reduced hyperphagia.

45. Nevertheless, given the severity and rarity of PWS and the absence of any approved drug treatment for hyperphagia, the FDA expressly invoked "***regulatory flexibility***," citing "***the rare disease context, and the lack of approved pharmacologic treatments for hyperphagia***."

---

[1] *See* Drug Approval Package: VYKAT XR (NDA 216665), Drugs@FDA, U.S. Food & Drug Admin., https://www.accessdata.fda.gov/drugsatfda_docs/nda/2026/216665Orig1s000TOC.html (last visited [August 27, 2026]) (stating "Date created: April 27, 2026"). The FDA's application-review materials for Vykat—including the Integrated Review, Risk Assessment and Risk Mitigation Review, Other Reviews, and Administrative and Correspondence Documents—are archived in the agency's 2026 NDA directory, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2026/, whereas Vykat's approval letter and prescribing information, which were made public contemporaneously with approval, are archived in the agency's 2025 directory, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2025/.

Thus, the FDA approved Vykat despite acknowledged limitations in the evidence supporting its efficacy—not because those limitations did not exist.

46. The FDA likewise did not treat Vykat's safety profile as a closed issue: the agency specifically required "enhanced pharmacovigilance" after approval to continue monitoring the risk of hyperglycemia. Thus, the FDA also required heightened post-approval monitoring of an important safety risk.

### C. The Class Period Begins: Defendants Announce FDA Approval Of Vykat, Touting Its "Well-Established Safety Profile" And "Robust And Durable Clinical Data" Showing That Vykat "Significantly Impacts Hyperphagia"

47. After the close of trading on March 26, 2025, Soleno announced that the FDA had approved Vykat. After the approval, Defendants made a series of statements portraying Vykat as safer, more effective, and more commercially viable than the underlying data and facts supported.

48. Indeed, Defendants did not disclose a word of the FDA's doubts about Vykat's efficacy or the fact that its approval was primarily justified using "regulatory flexibility" in the context of a rare and severe disease with no available treatments. Instead, Soleno told investors that approval rested on an "***adequate and well-controlled study***" and that "***[e]fficacy was established***" in a Phase 3 "***multi-center, randomized, double-blind, placebo-controlled trial***." On the investor call that evening, Soleno's CEO, Defendant Bhatnagar, told investors that the approval was supported by a "comprehensive data package" that included "statistically significant data from a Phase III study." Defendant Manning, Soleno's Chief Commercial Officer, similarly emphasized the "***robust and durable clinical data supporting VYKAT XR as a treatment that significantly impacts hyperphagia***."

49. Defendants were equally emphatic about Vykat's safety. Soleno represented that the drug had a "***well-established safety profile with over four years of data across four double-blind and/or open label studies***." Bhatnagar reinforced that assurance on the call, telling investors that Vykat had a "***favorable safety and tolerability profile***."

50. Defendants tied those assurances directly to Vykat's commercial opportunity. Bhatnagar told investors that Soleno had identified approximately 12,000 diagnosed PWS patients

in the United States, including approximately 10,000 who comprised Vykat's "total on-label addressable market." Manning stated that approximately 80% of pediatric endocrinologists were willing to prescribe Vykat and identified as a commercial priority ensuring that patients could "easily start and stay on therapy." Bhatnagar added that among approximately 300 larger PWS prescribers, willingness to prescribe was likely "far north of 80%."

51. Analysts immediately embraced the clinical and commercial picture Defendants presented. Cantor Fitzgerald identified Vykat's "very strong clinical data" as a principal reason to recommend the Company's stock and nearly doubled its price target from $67 to $123. Other analysts expressly incorporated Defendants' commercial representations into their forecasts. Piper Sandler highlighted management's representation that approximately 80% of pediatric endocrinologists were willing to prescribe Vykat and its stated objective of enabling physicians to "easily start and maintain patients on therapy." Oppenheimer likewise cited Soleno's internal survey showing 80% physician willingness to prescribe, projected more than $2 billion in peak U.S. sales, and raised its price target from $73 to $105. Stifel raised its target from $74 to $108 and described Vykat as presenting a "blockbuster opportunity" for Soleno.

52. Fueled by Defendants' positive statements, Soleno's stock price skyrocketed on March 27, 2025—the first trading day after the announcement and the first day of the Class Period—surging 38% to close at $67.39 per share.

### D. Defendants Immediately Begin Cashing Out Of Soleno, Selling Tens Of Millions Of Dollars Of Stock While Secretly Exploring A Sale Of The Company

53. Defendants immediately capitalized on the dramatic stock price increase. On March 27, 2025, the first trading day after announcing Vykat's approval, the Company's most senior executives—Defendants Bhatnagar, Mackaness, and Manning—collectively sold 630,809 shares of Soleno stock for more than $42.7 million. Bhatnagar alone exercised options to acquire 523,809 shares and immediately sold every one of those shares, generating approximately $35.3 million in gross proceeds. Mackaness similarly exercised options for 70,000 shares and sold all of them for approximately $4.9 million, while Manning exercised options for 37,000 shares and sold all of

them for approximately $2.5 million. None of those sales was identified as having been made pursuant to a Rule 10b5-1 trading plan.

54. Significantly, the March 27 sales represented highly material portions of each Individual Defendant's shares then available for sale. Indeed, Bhatnagar and Manning each sold ***more than 40%*** of their respective available holdings, and Mackaness sold ***roughly 36%*** of his.

55. Moreover, nothing compelled the Individual Defendants to exercise and sell those shares when they did. The options Bhatnagar exercised did not expire until between 2028 and 2033; Mackaness's until between 2030 and 2033; and Manning's until 2034. Yet all three independently chose to exercise these long-dated options and sell every resulting share on the same day—the first trading day after Vykat's approval caused Soleno's stock price to surge. Their conduct also departed sharply from their prior trading practices: during the immediately preceding control period of equal length, none of the Individual Defendants sold a ***single share*** in a discretionary open-market transaction. Their March 27 sales therefore were neither routine tax-withholding transactions nor sales pursuant to preexisting trading plans, but contemporaneous decisions to monetize tens of millions of dollars of Soleno stock immediately following approval.

56. The Individual Defendants' March 27 stock sales were only one part of their effort to monetize their interests in Soleno following Vykat's approval. Almost immediately after approval, and unbeknownst to investors, Soleno's Board initiated a process to explore a sale of the entire Company. Indeed, documents Soleno filed with the SEC only after the Class Period revealed that Soleno had already received three acquisition proposals in "early April 2025"—within days of Vykat's March 26 approval. By April 16, Soleno had entered into a confidentiality agreement with another biopharmaceutical company concerning strategic opportunities. On May 22, one potential acquirer ("Party A") submitted a nonbinding proposal to acquire Soleno for $86 per share in cash, and the following day Soleno's Board authorized Centerview Partners and Guggenheim Securities to contact six additional potential acquirers.

57. The reaction of sophisticated potential acquirers after examining Soleno and Vykat was telling. Party A conducted initial due diligence on Soleno and Vykat and then withdrew its $86-per-share proposal in June 2025. Another potential acquirer ("Party B") entered into a

confidentiality agreement with Soleno in July and likewise terminated discussions after conducting due diligence, citing reasons "***including its concerns about Soleno's business prospects in Europe and a desire to continue to monitor VYKAT XR's commercial launch in the United States***." Thus, while Defendants were publicly touting Vykat's efficacy, safety, and enormous commercial opportunity, sophisticated prospective acquirers given the opportunity to examine Soleno more closely were declining to proceed based upon their review of confidential, undisclosed data.

58. The undisclosed sale process was significant to the Individual Defendants because an all-cash acquisition would enable them to monetize the remaining Soleno equity they retained after their March 27 sales. Indeed, after realizing more than $42.7 million from stock sales immediately following Vykat's approval, Bhatnagar, Mackaness, and Manning were, within days, participating in a process that would convert their remaining equity interests into cash as well—while also triggering millions of dollars in change-in-control payments. None of this sale process was disclosed to investors during the Class Period.

### E. Following Vykat's Launch, Defendants Continue To Tout Its Efficacy, Safety, And Demand—And Then Raise $230 Million From Investors

59. Following Vykat's commercial launch in April 2025, Defendants continued to present investors with an overwhelmingly positive portrayal of the drug's efficacy, safety, and demand. On May 7, 2025, in Soleno's first quarterly report following Vykat's approval, Defendants touted what they characterized as a strong start to the launch. Soleno reported that, in the first 29 business days following approval, it had received 268 patient start forms from 131 unique prescribers. Bhatnagar characterized those figures as demonstrating the "high level of interest" in Vykat and the "significant unmet need" the drug could address, and stated that Soleno was "very well positioned to sustain our current momentum." Asked on the earnings call what portion of those start forms had converted into paid prescriptions, Manning declined to say, while confirming Soleno tracked the answer: "We have our internal metrics, but I think it's too early to share what we're looking at."

60. Defendants were even more bullish in June. At the Jefferies Global Healthcare Conference on June 4, Bhatnagar told investors that the withdrawal-study results were "***about as convincing an evidence of efficacy as you would expect to see***," explaining: "You give the drug, there's an effect. You take the drug away, the effect goes away. You give the drug back, the effect comes back." He concluded that "***there's very little argument that this is a drug that really does work***." Bhatnagar likewise characterized Vykat's safety profile as "***more benign***" than that of its parent molecule in many respects and described its most common adverse events as "***typically grade 1/2, typically self-limiting***."

61. Six days later, at the Goldman Sachs Global Healthcare Conference, Defendant Mackaness again emphasized the depth of Soleno's safety experience, describing an "***extensive clinical trial safety database with greater than 100 PWS patients treated for over a year***" and representing that Vykat's "[s]afety profile is consistent with the parent molecule diazoxide." Mackaness also put Vykat's U.S. commercial opportunity at "[o]ver $2 billion."

62. On June 25, 2025, Soleno went further still. In a press release describing data presented at the United in Hope PWS conference, Soleno represented that Vykat "***can be safely administered to individuals with PWS who have pre-diabetes or diabetes***"—an affirmative safety assurance directed at the patients most exposed to the drug's mechanism, which works by suppressing insulin release.

63. The launch metrics Defendants chose to report continued to reinforce that positive narrative. On July 10, 2025, Soleno announced that it had received approximately 646 cumulative patient start forms from approximately 295 unique prescribers through June 30 and expected second-quarter Vykat revenue of between $31 million and $33 million. Soleno again did not disclose how many of those forms translated to patients who actually started the drug or how many patients had discontinued treatment—even though Manning had already acknowledged months earlier that the Company maintained launch metrics beyond the start-form figures it publicly reported.

64. By then, Soleno's stock was trading near its Class Period highs, having closed at $88.49 per share on July 9, 2025. Defendants used that elevated valuation to raise substantial

additional capital from investors. On July 10—the same day it announced the favorable launch metrics—Soleno priced an underwritten public offering of 2,352,941 shares at $85.00 per share. The underwriters exercised their option to purchase an additional 352,941 shares in full, bringing the offering to 2,705,882 shares and $230 million in gross proceeds. All of the shares were sold by Soleno. Notably, Soleno sold $230 million of its own shares to public investors at $85 per share while the undisclosed sale process was ongoing—and after Party A, which had initially offered $86 per share, had already withdrawn that offer following due diligence.

### F. Defendants Assure Investors That Vykat Has "Extraordinary Momentum" And "No New Safety Signals"

65. On August 6, 2025, Soleno reported its second-quarter results and again presented investors with an overwhelmingly positive picture of Vykat's commercial launch. In his prepared closing remarks, Bhatnagar stated that Soleno had shown "***extraordinary momentum in the number of start forms, patients on active drug, number of patients on paid drug and lives covered***." Although that statement revealed that Soleno was actively tracking how many patients were actually taking and paying for Vykat, Bhatnagar declined to disclose those figures, stating that the Company was "not able to share details at this time."

66. Defendants were equally reassuring about whether patients were staying on the drug. Asked by a Guggenheim analyst about "early compliance trends," Bhatnagar initially stated that "it's too early to tell" because Soleno had not seen much data. He nevertheless assured investors: "***what I can tell you is that discontinuation rates are substantially lower than what we saw even in clinical trials***," and added that Soleno did not "***expect that to change significantly***."

67. Later in the same call, a Cantor Fitzgerald analyst specifically asked what Soleno was seeing from Vykat's real-world safety experience. Bhatnagar acknowledged that commercial patients could have more comorbidities than patients enrolled in controlled clinical trials, but unequivocally responded: "***I can tell you that we have not seen anything in the post-marketing setting that is different from the clinical trial setting. So there are no new safety signals.***" He again represented that discontinuation rates were "***substantially lower than what we have seen in the clinical trials***."

68. As would soon begin to be revealed, however, Defendants' statements were materially false and misleading.

### G. Nine Days Later, The Scorpion Capital Report Begins To Expose The Efficacy, Safety, And Commercial Viability Problems Defendants Had Concealed From Investors

69. Just nine days later, on August 15, 2025, Scorpion Capital published an extraordinarily detailed 415-page investigative report concerning Soleno and Vykat. The Scorpion Report disclosed material new information concerning each of the subjects Defendants had been touting to investors—Vykat's efficacy, safety, and commercial prospects. Scorpion disclosed that it held a short position in Soleno. The firm was founded and led by Kir Kahlon, its Chief Investment Officer.[2]

70. The Scorpion Report was the product of a months-long investigation that was based on more than thirty interviews with individuals possessing direct experience with Vykat. Those sources included eight physicians who had served as investigators in Soleno's own clinical trials, three former Company employees who had worked on or overseen the clinical program, and eleven additional physicians and specialists—ten endocrinologists and one nephrologist—who treated PWS patients. Scorpion compared and corroborated those accounts against Soleno's own clinical-trial data, the Company's FDA label, published scientific literature, and Soleno's public statements, as well as contemporaneous reports from parents and caregivers of PWS patients who had taken Vykat.

71. Scorpion's sources were particularly significant because they were among the people best positioned to know whether Defendants' representations about Vykat were accurate. The investigators Scorpion interviewed were physicians whose own sites had enrolled and evaluated patients in the very studies on which Vykat's approval and Defendants' efficacy claims

[2] Kahlon previously worked for Seligman Investments, which manages ~$15 billion and is based in Silicon Valley and New York. Prior to Seligman, Kahlon worked with Tiger Global, a hedge fund focusing exclusively on deep-dive investigative shorts. Kahlon began his career at the global management consulting firm Bain & Company and entered the investment business in 2004 when he was hired by activist investor Carl Icahn. Kahlon graduated from UC Berkeley (BA) with Highest Honors in 1992 and Harvard Business School (MBA) in 1998.

rested. The former employees had worked inside Soleno on the clinical program itself, including in roles involving oversight of trial sites. And the treating specialists came from the relatively small community of physicians who actually cared for PWS patients and would decide whether to prescribe Vykat and keep patients on therapy. Their accounts repeatedly corroborated one another across different sources and across the Report's central subjects. Scorpion also submitted its findings to the FDA through a formal Citizen Petition, thereby inviting regulatory scrutiny of its conclusions.

### 1. The Scorpion Report Undermined Defendants' Claims That Vykat's Efficacy Was "Established"

#### i. The Scorpion Report Revealed That The Purportedly "Double-Blind" Trial On Which Soleno Obtained Approval Was Functionally Unblinded And Inherently Unreliable

72. Defendants repeatedly represented that Vykat's efficacy had been "***established***" through a rigorous "***randomized, double-blind, placebo-controlled***" withdrawal study. Indeed, Bhatnagar later described the study as "***about as convincing an evidence of efficacy as you would expect to see***."

73. But that result depended on the withdrawal study being truly double-blind—meaning neither the participants, nor their caregivers, nor the researchers knew who was receiving the actual treatment and who was receiving a placebo. Blinding a study mitigates several sources of bias which, if left unchecked, can quantitatively affect study outcomes and is viewed as a core tenet of clinical study design. Having a study be truly and completely double-blind is absolutely essential, for it (i) prevents bias by stopping researchers from treating patients differently or misinterpreting results based on expectations; (ii) prevents the "placebo effect" by keeping participants or their caregivers from imagining improvements just because they got the real medication; and (iii) is considered the gold standard for testing whether a drug actually works.

74. Making sure that the withdrawal study for Vykat was double-blind was even more imperative than in most cases, given that the study's primary endpoint was not an objective physiological measurement. Rather, it was a subjective questionnaire called the Hyperphagia Questionnaire for Clinical Trials ("HQ-CT"), completed by the patients' own parents and

caregivers. Thus, if caregivers could determine whether their children remained on Vykat or had been switched to placebo, their knowledge could directly influence the very endpoint on which the study's success depended.

75. The Scorpion Report revealed that this purportedly "double-blind" study was, in reality, "***functionally unblinded***." Vykat produced readily observable side effects—including excess hair growth, or hypertrichosis, and edema—that could reveal whether a patient was receiving active drug. Ex-Employee #1, who held a key role in Soleno's clinical-trial program, explained that with such a "***completely soft endpoint***," "***it's very hard to blind yourself to this drug***" because "***just from the side effects, it's pretty clear whether you're on active drug or not***."

76. The active drug also had a distinctive odor that the placebo lacked. Ex-Employee #1 stated that, "[a]t least in the Phase 3 trial, it did have a different smell," and that "***if you are smelling it, you could tell the difference between active and placebo***." That distinction was particularly significant in the small, closely connected PWS community. According to the former employee, parents communicated through WhatsApp and other online groups, comparing observations, asking "***is your kid on active or placebo?***" and directly discussing how to determine whether their children were receiving Vykat. Thus, the supposedly blinded treatment assignments were being actively discussed among the very caregivers responsible for scoring the efficacy endpoint.

77. Soleno's own trial investigators independently corroborated the same problem. Trial Investigator #3, a principal investigator involved in the Phase 3, open-label, and randomized withdrawal studies and a longstanding PWS authority, was likewise aware of the active drug's distinctive odor: "***the actual active drug smelled a bit, and it smelled differently from the placebo. And the message went around, and people could tell that it was the active drug***."

78. Significantly, the unblinding concern was not an accusation first raised by Scorpion after the fact. To the contrary, Soleno personnel working on the study had raised the same concern internally. When patients were switched from Vykat to placebo, visible side effects such as hair growth and swelling could begin to subside, signaling to caregivers that the patient was no longer receiving active drug. Asked whether caregivers' recognition of that change—rather than an actual

loss of therapeutic effect—could have driven the reported worsening in HQ-CT scores, Ex-Employee #1 responded: "***You raise a very good point. It's something that many of us who were working on the trial raised and felt was valid***."

79. Trial Investigator #6, a pediatric endocrinologist who participated in the Phase 3 study, independently identified the visible side effects as destroying the blind. He explained that "***the hair thing is really difficult and same with the edema because you can't control for that***" and concluded that "***you'll never be able to blind that properly***." Indeed, his site correctly identified which patient had received Vykat based on "***the distribution of the hair that he was growing***." Trial Investigator #5 similarly stated that there "***certainly was potential for unblinding. No question***."

80. The fact that the study was functionally unblinded changed the picture Defendants had presented to investors and compromised the internal validity of the research. The withdrawal study's apparent efficacy depended on caregivers unknowingly scoring changes in hyperphagia after patients were switched between active drug and placebo. Scorpion instead revealed that the drug's visible effects and distinctive odor could disclose treatment assignment; that families exchanged information about which patients were receiving active drug; that multiple investigators independently recognized the problem; and, most importantly, that Soleno personnel themselves had raised internally the concern that the reported placebo-group deterioration could reflect caregivers recognizing that their children had been taken off Vykat rather than a genuine loss of therapeutic benefit.

**ii. The Scorpion Report Revealed That The Subjective Questionnaire On Which Vykat's Pivotal Efficacy Result Depended Was Unreliable And Manipulable**

81. The functional unblinding was especially significant because the pivotal withdrawal study did not measure Vykat's efficacy through an objective physiological endpoint. Instead, its primary efficacy endpoint depended on the Hyperphagia Questionnaire for Clinical Trials ("HQ-CT"), a questionnaire completed by the patients' own parents and caregivers. Scorpion revealed that Soleno's own trial investigators regarded the HQ-CT as subjective,

unreliable, and susceptible to manipulation by the very caregivers whose assessments determined whether the study succeeded.

82. Trial Investigator #6 stated bluntly: "***I don't think the HQ-CT score is very good***." He explained that the "perception of hyperphagia" was "***a tricky one to quantify***" and that "***the problem with any kind of score like that is it is possible to manipulate it***." Another endocrinologist and PWS expert independently described the HQ-CT as "***not a great marker***" because "[i]t's a subjective score. It's not a hard and fast measurement," and could vary depending on whether "the mom, the dad, or grandparents" completed it.

83. That investigator also questioned whether the unusually high baseline scores in Soleno's trials reflected the severity he observed in actual PWS patients. Reviewing Soleno's reported baseline scores, he remarked: "***that's a very high score. And most of my patients are nowhere near that.***" He questioned whether the subsequent decline in those scores demonstrated a genuine drug effect at all: "***If they've got such a high score, is it just purely a placebo effect ... is that really the drug? Is that placebo? Is that the fact that they've done a trial? I don't know***."

84. More troublingly, Scorpion revealed evidence that caregivers had actually manipulated the HQ-CT to obtain access to Vykat. Enrollment in the Phase 3 study required patients to meet a minimum HQ-CT threshold. Trial Investigator #1, a leading PWS expert, reported that families appeared to know the score necessary to qualify and that patient after patient arrived at his site with the same qualifying score: "***they come in 13, 13, 13***." After the third or fourth identical score, the investigator began questioning why every patient was presenting at precisely the threshold. He attributed the pattern to families desperate to try the drug and communicating with one another through social media. Trial Investigator #6 independently stated that such conduct would not surprise him and acknowledged that the resulting analysis would have been "***skewed if they have overexaggerated***."

85. These revelations materially compounded the unblinding problem. The efficacy result Defendants portrayed as rigorous proof that Vykat "really does work" ultimately depended on subjective caregiver assessments that investigators themselves regarded as manipulable—while Scorpion uncovered evidence that caregivers knew how the questionnaire worked, communicated

with one another about obtaining the active drug, and in fact appeared to manipulate the scores necessary to enter the study. Combined with the evidence that caregivers could infer treatment assignment, the Report raised fundamental questions about whether the reported HQ-CT differences reflected Vykat's therapeutic effect or the expectations and knowledge of the caregivers scoring the endpoint.

**iii. The Scorpion Report Revealed That Vykat's Efficacy Data Was Concentrated Among Three Investigators, Soleno Personnel Questioned The Objectivity Of Its Largest Enroller, And Soleno Employees Themselves Questioned The Withdrawal Study Result**

86. The Scorpion Report revealed another undisclosed problem with the efficacy evidence Defendants portrayed as rigorous and compelling: a disproportionate share of the data was generated at only three trial sites, including one led by an investigator whose objectivity Soleno's own personnel questioned. That concentration was particularly significant because Vykat's efficacy depended on subjective caregiver questionnaires and investigators' assessments of their own patients—making the independence and objectivity of the investigators responsible for generating the data especially important.

87. A former Soleno employee who held a senior medical-affairs role and was closely involved in the clinical trials identified Dr. Jennifer Miller as the "***biggest enroller***," Dr. Eric Felner as "***number two***," and Dr. Nicola Bridges in the United Kingdom as the third-largest enroller. Outside those three sites, the former employee stated, "***the rest of them had three or fewer***" patients. The three sites together enrolled "***in the 40 to 50 ballpark***" of the approximately 127 patients randomized in the Phase 3 study—roughly one-third of the entire study population.

88. The concentration was even greater in the 77-patient randomized withdrawal study on which Vykat's approval ultimately rested. According to the same former Soleno employee, Miller and Felner alone enrolled approximately 20 to 30 of the 77 patients—as much as roughly ***40%*** of the entire study population. Thus, a substantial portion of the supposedly independent clinical evidence Defendants repeatedly touted to investors originated from just two sites.

89. Scorpion further revealed that Soleno personnel had serious concerns about Miller, the largest enroller. Ex-Employee #1 stated that Miller "***really skewed the data***" and that other

drug sponsors generally would not permit such a large percentage of patients to come from one site. According to the former employee, he and others at Soleno were skeptical of Miller because it was apparent from their interactions that she was "***too much in bed with the company and didn't have academic objectivity***." He explained that where an investigator has already decided that a drug will work, "***it defeats the purpose of a blinded trial***"—a problem that was particularly acute where efficacy depended on subjective assessments rather than objective measurements.

90. A second former Soleno employee who had oversight responsibility for the clinical program independently corroborated those concerns. Ex-Employee #2 stated that Miller "***behaved very strangely with regards to her patients***," was "***very determined to get as many patients as possible into the study***," and that "***I have doubts around her assessment of global improvement.***" According to that former employee, senior leadership "***felt their hands were bound***" because Soleno was already deep into a Phase 3 study and Miller "***was the primary, the most prolific enroller***."

91. Most significantly, Scorpion revealed that Soleno's own personnel seriously questioned the results the withdrawal study ultimately produced. A former senior medical-affairs employee reported that the unusually rapid and extreme worsening in the placebo group "***was a conversation that was had internally***." Soleno personnel were "***surprised to see that it was so extreme, especially given the fact that it seemed to happen so quickly after they came off the drugs***"; they "***didn't expect that***" and instead expected a slower withdrawal. Yet, according to the former employee, "***it was the data that it was, and they moved forward with it.***" Asked whether personnel inside Soleno actually believed the result, the employee responded: "***Well, so much of the data is subjective. It's a subjective opinion***."

92. These revelations further undermined Defendants' portrayal of the withdrawal study as compelling objective proof that Vykat worked. The study's efficacy result was generated using a subjective and manipulable endpoint in a trial that was not double-blinded; a substantial share of its patients came from only two sites; Soleno personnel questioned the objectivity of its largest enroller; and when the study produced the unusually rapid deterioration on which Vykat's

efficacy claim depended, Soleno's own personnel found the result surprising and questioned the subjectivity of the underlying data.

**iv. The Scorpion Report Revealed That Many Of The Physicians Who Conducted Soleno's Trials Did Not Observe Meaningful Benefit In Their Own Patients**

93. Most damagingly, the Scorpion Report revealed that numerous physicians who actually conducted Soleno's clinical trials—including investigators who participated across the Phase 3, open-label, and withdrawal studies and co-authored Soleno's own publications—reported that they did not observe the meaningful clinical benefit Defendants were describing to investors. These were not outside commentators evaluating published data from afar. They were the physicians who enrolled, treated, and evaluated the very patients whose results Defendants relied upon to claim that Vykat's efficacy had been "established."

94. For example, Trial Investigator #1, a prominent PWS authority and co-author on a Soleno trial publication, stated flatly: "***I just didn't think it worked.***" He saw no benefit remotely commensurate with Vykat's approximately $500,000 annual cost: "***I didn't see $500,000 worth of—or $5,000 worth of benefit***." He stated that he did not intend to prescribe Vykat—"***I won't use it***"—and would advise other physicians to "hold off." He attributed Soleno's favorable efficacy result to the flawed withdrawal study rather than to a clinical effect he had observed in his own patients: "***I think they played with the data until they finally got something that worked***."

95. Trial Investigator #3, a longstanding PWS authority who participated in the Phase 3, open-label, and withdrawal studies, described substantially the same experience: "***to be frank, my feeling was I don't think anyone improved***." He recalled patients who continued gaining weight despite receiving active drug, including one patient who "***put on a lot of weight, so clearly, this was not effective***." Because he was unconvinced that Vykat provided meaningful benefit, he affirmatively encouraged his own patients not to continue into the open-label extension. Of approximately five patients he had enrolled, only one ultimately remained on Vykat—and he was skeptical even of the benefit perceived by that patient's mother.

96. Trial Investigator #4, an endocrinologist and PWS authority who participated in all three studies and co-authored a Soleno trial publication, likewise reported that none of his patients

remained on Vykat. As he explained, "***none of mine continued on it either because they didn't want to or not having much effect—overall this isn't a miracle drug, that's for sure.***" More directly: "***they stopped it because they just didn't see any benefit. It wasn't doing much and they were still very obese***." He also questioned a fundamental inconsistency in Soleno's efficacy story: "***I would have expected that if hyperphagia went down, we would see…weight went down as well…we didn't see that in this study. I'm not quite sure what's going on there***."

97. Trial Investigator #7, another co-author who participated in all three studies and helped develop PWS treatment guidelines, similarly reported "***not a huge difference in my patients***" and questioned what improvement Soleno was actually measuring. He emphasized the potential role of placebo effects: "***all these drugs have a strong placebo effect...you could argue that it was placebo effect***."

98. Trial Investigator #5, a substantial enroller and co-author on Soleno's publications, reported that only two of approximately ten patients he enrolled remained on Vykat. Asked how many had responded, he identified just one—and immediately qualified even that result: "***well, one. And I wouldn't call it a wow response***." Moreover, the apparent response did not emerge until the patient had been taking Vykat for approximately a year and a half.

99. Trial Investigator #5 also described a patient whose experience was directly contrary to the effect Defendants attributed to Vykat. The patient "***probably put on 50 pounds during the 13-week C-601 [pivotal phase 3] trial and then rolled over [to open label] and continued to put on weight***," ultimately prompting her family to withdraw her from the study so that she could be hospitalized. The investigator believed she had been receiving active drug from the outset because "***she got hairy…so I was pretty sure she was on real drug***." He contrasted that experience with another experimental PWS therapy whose appetite-suppressing effect families could recognize immediately. Vykat, he explained, "***is not immediate. It is not a profound suppression of appetite***."

100. These accounts came from different investigators at different trial sites, yet they repeatedly told the same story: the physicians who administered Vykat and observed patients firsthand did not see the robust and meaningful clinical effect Defendants represented to investors.

Several had stopped using or recommending the drug; some affirmatively advised patients not to continue; and multiple investigators reported substantial patient attrition because the perceived benefit was insufficient. Their firsthand experience stood in stark contrast to Bhatnagar's assertion that the withdrawal study left "***very little argument that this is a drug that really does work***."

**2. The Scorpion Report Revealed Serious Safety Problems That Defendants Had Minimized During The Trials—And That Began Reemerging In Commercial Patients**

101. The Scorpion Report also disclosed material new information undermining Defendants' repeated assurances of Vykat's "well-established safety profile with over four years of data across four double-blind and/or open label studies." Although investors knew that fluid retention and hyperglycemia were recognized risks of Vykat, the Report revealed a substantially more troubling picture concerning the severity and clinical consequences of those risks and how they had been treated during development. Serious fluid-retention, cardiac, and metabolic complications had already occurred in trial patients, while former Soleno personnel and trial investigators reported that the Company had sought to minimize adverse events and resist attributing them to Vykat. And soon after Vykat reached the market, substantially similar complications began appearing in newly treated commercial patients—including serious edema, respiratory and cardiac complications, and sharply elevated blood glucose—culminating in multiple hospitalizations and caregiver reports that directly contradicted Bhatnagar's August 6 assurance that Soleno had seen nothing in the post-marketing setting that was different from the clinical trials and "no new safety signals."

**i. The Scorpion Report Revealed That Soleno's Publications Obscured Serious Trial Safety Events, Including Diabetes And Fluid-Overload Hospitalizations**

102. The Scorpion Report revealed significant safety problems that had emerged during Vykat's clinical development but were either omitted from Soleno's publications or reported in ways that obscured their incidence, severity, and clinical consequences. Although investors knew that hyperglycemia and edema were recognized risks of Vykat, they did not know the full extent

of the diabetes, fluid-overload, and cardiac complications that physicians and former Soleno personnel later described to Scorpion.

103. Multiple Scorpion interviewees described trial patients who developed diabetes while receiving Vykat—outcomes that could not be discerned from Soleno's aggregate reporting of "hyperglycemia." For example, a PWS expert who had been involved in Soleno's clinical program and had reviewed Soleno's Phase 3 data with the Company stated: "***I do know at least two families that dropped out of the Vykat study, and both of their kids got diabetes, and they were not pre-diabetic***." Both patients were in their early twenties and only slightly overweight. According to the expert, each developed diabetes within approximately two months of beginning Vykat, discontinued after approximately four months on the drug, and was "***still now struggling with controlling diabetes***" two to three years later.

104. Soleno's own trial investigators independently described similar metabolic complications in their patients. Trial Investigator #2—a physician at one of the largest PWS centers in the United States and a co-author of a Soleno trial publication—reported that "***two out of 15 developed diabetes and others developed hyperglycemia***." Trial Investigator #3 stated that his site "***had to pause one person whose blood sugar levels got a bit out of control***." Trial Investigator #8, a co-author on Soleno's publications who had also served as a paid consultant to the Company, reported starting one patient on metformin because "***I was worried about the glucose increase***"; the patient ultimately discontinued after experiencing both a drug reaction and elevated blood glucose. And a pediatric endocrinology division chief reported that Dr. Jennifer Miller, Soleno's largest-enrolling investigator, had told him that she had a teenage patient "who was developing diabetes" on Vykat and intended to stop the drug.

105. Yet Soleno's public reporting did not permit investors to determine how many trial participants had actually developed diabetes. The Phase 3 publication's adverse-event table did not use the word "diabetes," reporting instead "hyperglycemia" and "blood glucose increased." Soleno's label likewise grouped diabetes within its broader hyperglycemia category. Thus, although investors knew that Vykat could elevate blood glucose, the public record did not reveal that multiple investigators reported actual diabetes among their patients, or that a PWS expert who

had reviewed Soleno's own data knew of two patients who were not previously pre-diabetic and who developed diabetes shortly after beginning Vykat and remained unable to control the disease years later.

106. The distinction was significant. Hyperglycemia (high blood glucose) is a temporary condition and simply means the patient has a high level of sugar in the blood. It is entirely possible—and common—to have a temporary spike in blood glucose without having diabetes, and common causes include stress from an illness or infection, certain medications such as steroids, and eating a large meal high in carbohydrates. Diabetes, on the other hand, is a chronic disease that happens when a person's body cannot produce enough insulin or cannot use insulin effectively, which leads to ongoing, repeated episodes of hyperglycemia.

107. By not reporting actual cases of diabetes, and instead labeling them hyperglycemia, Soleno was able to obscure and minimize one of the most severe side effects of Vykat. Indeed, as Ex-Employee #1 explained, Soleno's characterization of the diabetes risk was a form of minimization, describing the Company as "***kind of downplaying it and calling it hyperglycemia rather than diabetes risk and insulin resistance***."

108. The Scorpion Report also revealed serious fluid-overload and cardiac events during the Phase 3 program whose clinical severity was not apparent from Soleno's publications. Ex-Employee #1, who held a key role in Soleno's clinical-trial program, stated that he believed two patients had been hospitalized with potential heart failure. One patient at Massachusetts General Hospital "***was admitted for fluid overload and potential heart failure***," while the other patient was hospitalized in the United Kingdom. According to the former employee, the patients were young and ***did not have "significant underlying cardiac disease or renal disease"*** that would readily explain the events.

109. A Soleno trial investigator independently corroborated the United Kingdom hospitalization, although the investigator described the event differently. Trial Investigator #8 reported that the patient, who was "nearing 18," became severely ill a few months into the Phase 3 study and was hospitalized with "severe pneumonia" and "***heart and lung involvement***." Trial Investigator #2 separately reported that physicians had to administer diuretics to some trial

participants to manage fluid overload. These accounts reinforced that the edema observed in the trials was not invariably a mild or self-limiting swelling event, but in some patients required medical intervention and hospitalization.

110. Soleno's publications did not disclose the events with the clinical detail later supplied by Scorpion's sources. The Phase 3 paper reported six serious adverse events, all in Vykat-treated patients, and stated that only one was considered drug-related: "***peripheral and pulmonary edema in the setting of an unrelated concurrent pneumonia***." Its adverse-event table listed only "peripheral edema" as an edema category. Across the Phase 3 and open-label program, Soleno later reported twenty serious adverse events among 125 patients, while classifying only two as related to Vykat and describing those events as "peripheral/pulmonary edema" and "fluid retention."

111. The Scorpion Report also identified a troubling pattern in Soleno's edema data. The Phase 3 publication reported edema in approximately 20% of Vykat-treated patients during the 13-week controlled study, while the publication reporting the longer open-label experience reported edema in 30.4% of participants. But because the latter publication pooled adverse events occurring during the extension with those already experienced during the preceding Phase 3 study, an investor could not determine the incidence attributable specifically to prolonged exposure. The higher reported prevalence in the longer-term dataset therefore raised an obvious question about whether fluid retention increased with continued treatment, while Soleno's reporting prevented investors from answering it.

112. According to Scorpion's sources, this pattern of incomplete and opaque safety reporting was consistent with pressure inside Soleno to minimize adverse events and avoid attributing them to Vykat. Ex-Employee #1 stated that "in general, the company did downplay the diabetes risk and also downplay some of the serious adverse events that were reported," and stated that this pressure extended to trial investigators, *i.e.*, that there was "***certainly some pressure on all the investigators to downplay the adverse effects***." Ex-Employee #1 attributed much of that pressure to a specific individual within Soleno (whose identity the Scorpion Report redacted) and to the financial incentives of Soleno's senior personnel. Presented with the account of a trial-paper

author who was pressured to downplay safety data and then dropped from subsequent publications, Ex-Employee #1 responded that "your read is absolutely right," and stated: "I was extremely uncomfortable with the direction from [redacted] to try and downplay things." Ex-Employee #1 further stated that "***people are highly incentivized to downplay things that could be on the fence***" and that where causation could be characterized as uncertain, such events might not be included in publications. He described "[t]he atmosphere at the company" as "***very much to downplay the adverse effects***" and stated that when the hospitalizations occurred, "***[t]here was a lot of pressure to not have the investigator assessment to be causally related to the study drug***."

113. Trial Investigator #2 independently described the same pressure from the investigator's perspective. He stated that physicians "***had to insist on putting in all those side-effects***" because the complications initially were not included, and characterized Soleno's approach as "***play it down, play it down, which they have done in other papers as well***." Trial Investigator #2 also corroborated Ex-Employee #1's account of Soleno removing trial paper authors from publications when they did not cooperate with downplaying adverse events and side effects. Specifically, Trial Investigator #2 reported that, after he criticized Soleno's treatment of the adverse-event disclosures, he was not included as an author on later publications and was not even told that those papers were being prepared: "***I was very critical, and they didn't want to talk about the side effects, which I insisted on. And then the next papers, I was not even a co-author***." Trial Investigator #2 similarly recalled the exclusion of another principal investigator who had enrolled a substantial number of subjects. He described the exclusion as "bizarre"—as "[s]he would have recruited a big number, yet her name is not on the paper." Asked about other trial investigators, he stated: "***Many, yeah. Many got excluded***."

114. A key opinion leader in the PWS field who was involved with Soleno's clinical program and its FDA process, has conducted a large number of PWS trials, and is highly networked among PWS physicians and patient associations, described a pervasive sense that Soleno's communications and publications were "***downplaying the side effects***," and described them as akin to "***propaganda***."

**ii. The Scorpion Report Revealed Serious Post-Launch Adverse Events That Occurred Before Bhatnagar Assured Investors That Soleno Had Seen Nothing Different And "No New Safety Signals"**

115. The significance of the clinical safety problems revealed by Scorpion became still more apparent once Vykat entered commercial use. Within weeks of launch, caregivers began reporting the same categories of fluid-retention, respiratory, cardiac, and metabolic complications that had appeared during the clinical program—but now in patients newly initiating Vykat rather than the long-treated population Defendants repeatedly invoked as evidence of the drug's favorable safety profile.

116. On June 14, 2025, a mother reported that her child had been hospitalized four days earlier and had been taken off Vykat as a result. Beginning June 30, another mother documented uncontrollable fluid accumulation during her child's fifth week on Vykat. The family stopped Vykat while the child received Lasix, a potent diuretic used to remove excess fluid. When Vykat was restarted, the child regained five pounds of fluid within days. Approximately three weeks later, the family discontinued Vykat altogether, after which the child lost ten pounds of fluid in a single week.

117. Additional serious reports soon followed. On July 20, the parent of a 25-year-old reported that the patient had been admitted to the hospital two days earlier with pulmonary edema and potential heart failure. In a follow-up report, the parent stated that the patient had spent four days hospitalized on oxygen and that the family had been "***instructed by endo to stop vykat asap***." On July 28, another parent reported that her eleven-year-old had spent seven weeks hospitalized "***due to respiratory failure from fluid overload***" after approximately six weeks on Vykat, including one week on a ventilator. According to the parent, the child had been "tested for everything possible, all negative," the "[f]inal diagnosis was fluid overload from the vykat," and—critically—the case had "***been reported to Soleno and the fda***."

118. Nor were these isolated reports. Throughout June and July 2025, caregivers described peripheral swelling so severe that patients could not walk or put on shoes, fluid-related weight gains of ten to sixteen pounds, swelling around the eyes, and blood glucose rising into pre-

diabetic or diabetic ranges within weeks of beginning Vykat. Families reported discontinuing Vykat—or deciding not to start it—because of these effects.

119. At the same time, Soleno's own commercial field force was discussing these same risks with prescribers as conditions requiring active monitoring and management. A pediatric endocrinologist at an academic center with approximately fifty PWS patients described a meeting with a Soleno representative before August 6. According to the physician, the representative discussed prescribing Vykat "***with a glucometer***" provided to the family, specifically discussed pulmonary edema, described "***treating kids with diuretics as a standard of care with this medication***," and offered a handout instructing families "***how to recognize edema***" at home.

120. Then, on August 3—just three days before Bhatnagar assured investors that there were "no new safety signals"—the mother of a five-year-old reported that, after his Vykat dose was increased, he had become "very sleepy," developed "increased blood sugar levels," and was experiencing "respiratory problems when asleep." Critically, she stated that she had "***reported it to panther***"—PANTHERx, Soleno's sole specialty pharmacy partner through which Vykat prescriptions were dispensed. Days later, the parent reported that the child's blood glucose had spiked to 256.

121. Against this backdrop, Bhatnagar's August 6 assurances presented investors with a materially incomplete picture. By then, serious fluid-retention and metabolic complications had already occurred during Vykat's clinical development; former Soleno personnel and investigators reported that those events had been minimized or obscured; substantially similar complications were appearing in newly treated commercial patients; one caregiver expressly reported a seven-week hospitalization to Soleno itself; another had reported her five-year-old's symptoms to PANTHERx; and Soleno's own field force was discussing pulmonary edema, glucose monitoring, and diuretics with prescribers. Bhatnagar himself acknowledged that post-marketing surveillance "***relies on reports from caregivers or health care providers***." Yet in the same response he assured investors that Soleno had "***not seen anything in the post-marketing setting that is different from the clinical trial setting***" and that there were "***no new safety signals***."

122. The assurance was particularly misleading because Defendants had repeatedly invoked the clinical trials themselves as proof of Vykat's "well-established" and "favorable" safety profile. Thus, telling investors that emerging commercial experience was merely consistent with the clinical trials did not disclose the true picture: investors had never been told the full extent or severity of the diabetes, fluid-overload, and cardiac complications that had occurred during those trials, or the efforts within Soleno to minimize and avoid attributing those events to Vykat.

123. The reports did not abate after Bhatnagar's assurance. On August 8—only two days later—one parent reported that her son had spent five days in the hospital, was now requiring weekly cardiology visits, and that the family had "***been working a month now to get the fluid off***"—placing the underlying fluid-retention problem well before Bhatnagar's August 6 statement. The same day, another parent reported that her child, within the first week on Vykat, was "***getting psychotic and very confused***," with elevated blood pressure and an irregular heartbeat. Other caregivers reported that endocrinologists were prescribing glucose monitors when initiating Vykat.

**3. The Scorpion Report Revealed That The Same Efficacy And Safety Problems Materially Undermined Vykat's Commercial Prospects**

124. The efficacy and safety problems revealed by the Scorpion Report directly undermined the commercial opportunity Defendants had presented to investors. Soleno's revenue depended on physicians prescribing Vykat, insurers paying for it, and patients remaining on therapy. Scorpion's investigation revealed problems at each step: physicians who had administered Vykat reported little or no meaningful benefit, patients were discontinuing because of insufficient efficacy and adverse effects, and treating specialists and payors expressed substantial reluctance to prescribe or cover the drug.

125. The experience of Soleno's own trial investigators was particularly inconsistent with Defendants' repeated assurances concerning Vykat's efficacy and patients remaining on the drug. One investigator reported that none of his patients remained on Vykat because they "***just didn't see any benefit***"; another, who had enrolled approximately ten patients, reported that only two remained on the drug approximately three years later; and a third reported that only one of approximately five patients remained and that he had encouraged families not to continue because

he "***wasn't convinced that there'd been any benefit***." Even Trial Investigator #8—whom Scorpion described as a paid Soleno consultant who had been publicly promotional of Vykat—reported that almost all of approximately ten patients enrolled at the investigator's site had discontinued, citing "***drug reaction***," "***side effects***," or that patients "***didn't want to be in the trial anymore***." Scorpion further noted the substantial attrition across Soleno's clinical program: 127 patients were randomized in the Phase 3 study, 83 remained at the end of the open-label extension, 77 entered the withdrawal study, and approximately 60 ultimately submitted commercial start forms following approval.

126. The Report also revealed that the start forms Defendants touted did not necessarily translate into treated patients. A pediatric endocrinologist at a major PWS center reported submitting close to fifteen start forms, of which only three had been approved, six had been denied, and four remained unresolved. Other specialists reported similar difficulties obtaining coverage or had submitted few or no start forms at all.

127. That evidence stood in sharp contrast to Defendants' portrayal of approximately 10,000 U.S. PWS patients as Vykat's total on-label addressable market and a commercial opportunity exceeding $2 billion. Indeed, these problems materially narrowed the commercial opportunity Defendants had presented to investors. A former senior Soleno employee estimated that, given Vykat's efficacy, safety, reimbursement, and patient-selection limitations, the realistic U.S. market was only "***maybe as much as 10% to 15%***" of PWS patients and "***not beyond that***." A trial investigator independently responded "***At most***" when asked whether even 10% of PWS patients represented the addressable population.

### H. Defendants Deny The Scorpion Report And Continue To Reassure Investors About Vykat's Safety And Patient Persistence

128. The new material information revealed in the Scorpion Report caused an immediate stock price reaction. Following its publication, Soleno's stock price fell $9.27 per share, or approximately 12%, over two trading days—from $77.36 per share on August 14, 2025, to $68.09 per share on August 18, 2025—erasing hundreds of millions of dollars in market capitalization. Rather than correct their prior representations, Defendants emphatically rejected the Report's

conclusions and continued to assure investors that Vykat's real-world safety experience and patient persistence remained favorable.

129. On August 21, 2025, Bhatnagar gave an interview to STAT News's[3] senior biotech columnist, Adam Feuerstein, to address the Scorpion Report. During the interview, Bhatnagar emphasized that Soleno was monitoring "***literally hundreds of patients***" and represented that this monitoring had revealed no "***surprising or worrisome issues that would warrant FDA action***." Bhatnagar further assured investors: "***Overall, what we're seeing is consistent with the drug's label***." He did not disclose the commercial hospitalizations, diabetes cases, or other serious events described by Scorpion, or the reports from Soleno's own former personnel and investigators concerning pressure to minimize adverse events.

130. Defendants continued their assurances in September. At the Cantor Global Healthcare Conference on September 3, Bhatnagar was asked directly what Soleno was "seeing from a safety side in commercial use" and how that experience compared with the clinical trials. Bhatnagar responded that the hyperglycemia, peripheral edema, and fluid retention observed commercially were "***similar to what we expect from the known side effect profile of the drug***." Asked whether serious adverse events could develop suddenly, he represented that hyperglycemia and edema were "***trackable***," "***should all be trackable***," and "***should never happen in an overnight type of setting***."

131. The following day, Bhatnagar again reassured investors about patient persistence. At the Wells Fargo Healthcare Conference on September 4, he told investors that Vykat's commercial experience was "***actually pretty consistent with our clinical trial population***" and stated that the adverse-event discontinuation rate was only "***about 5.2%***," compared with "***about 4.8%***" in the 13-week clinical trial. He characterized the two rates as "***very similar and actually surprisingly low***."

[3] STAT is a prominent American journalism site that focuses on health, medicine, science, and the life sciences industry.

132. Less than one week later, a new safety event again rattled investors. On September 10, 2025, Soleno reported that a 17-year-old patient who had been taking Vykat had died from an apparent pulmonary embolus. Soleno's Form 8-K reporting the death was signed by CEO Bhatnagar. Significantly, the corresponding report in the FDA's Adverse Event Reporting System ("FAERS") disclosed that the patient had died ***August 11, 2025***—a full month before the Form 8-K was filed—and that the absolute latest date on which Soleno could have known about the death was ***August 22, 2025***—twelve days before Bhatnagar assured investors at the September 3, 2025 investor conference that the adverse events Soleno was seeing had been "similar to what we expect from the known side effect profile of the drug."

133. News of the report caused Soleno's stock to fall sharply, including as much as 28% intraday; over two trading days, the stock declined from $70.21 per share on September 9 to $56.72 per share on September 11, a drop of approximately 19%.

134. Soleno responded by again defending Vykat. In the Form 8-K, the Company stated that "***VYKAT XR has a proven safety and efficacy profile and was approved by the FDA following a rigorous clinical program***," emphasized the significant comorbidities and reduced life expectancy associated with PWS, and cautioned that a FAERS report does not establish causation. At the same time, Soleno announced that it would generally cease publicly commenting on future adverse-event reports, including deaths: "***Going forward, Soleno does not intend to specifically comment on adverse events cases (including deaths) unless directly related to VYKAT XR use and unexpected per the U.S. Prescribing Information***."

### I. Defendants Admit That Significant Safety Concerns Have Materially Disrupted Vykat's Launch

135. On November 4, 2025, Soleno reported its third-quarter results and, for the first time, disclosed commercial metrics that materially changed the picture Defendants had presented throughout the Class Period. Soleno reported 1,043 cumulative patient start forms since approval, including 397 during the third quarter, but only 764 patients actively taking Vykat as of September 30. Thus, for the first time, investors could see that the start forms Defendants had repeatedly

highlighted did not translate one-for-one into patients actually receiving the drug—a gap of 279 between cumulative start forms and active patients.

136. Soleno also disclosed that approximately 8% of patients had discontinued Vykat because of adverse events and that total discontinuations were approximately 10%. Even more significant than the percentage itself was what Defendants now acknowledged was causing patients to stop treatment. Asked which adverse events were driving the discontinuations, Bhatnagar identified ***peripheral edema and hyperglycemia***—the same fluid-retention and metabolic problems the Scorpion Report had documented in commercial patients and Soleno's own trials, and which Defendants had repeatedly characterized as manageable, expected, and not indicative of any new safety signal.

137. Defendants further acknowledged that the safety issues raised by the Scorpion Report were having a direct effect on Vykat's commercial prospects. In his prepared remarks, Bhatnagar admitted that Soleno had experienced a "***disruption in our launch trajectory in the wake of a short seller report***," which manifested "mostly in the form of a lower number of start forms and increased discontinuations for non-serious adverse events." When an analyst asked how Soleno could be confident that the Report was responsible, Bhatnagar stated that the Company had seen a decrease during August and September and "***we think that there is an effect***," particularly among patients who had experienced adverse events.

138. Bhatnagar later made the connection still more explicit. Asked about the adverse events leading to discontinuations, he stated: "***I think what's happened is a concern that's been created because of the adverse event profile of the drug***." As a result, Soleno was devoting significant resources to convincing patients and physicians to remain on or initiate Vykat, including patient-to-patient outreach, physician-to-physician programs, community events, and a webinar attended by more than eighty families. In other words, Defendants themselves acknowledged that the safety concerns publicized by Scorpion were affecting whether patients initiated and remained on Vykat—the precise commercial consequence the Report had warned would follow from the drug's true safety profile.

139. The commercial uncertainty was also reflected in Defendants' refusal to provide revenue guidance. Asked when Soleno might provide annualized revenue guidance for Vykat, Mackaness responded that it was "***a bit early at this stage***" and that the Company was "***looking for a little bit of maturation in the various components of the business***." Thus, even after reporting third-quarter revenue above consensus expectations, Defendants declined to provide investors visibility into Vykat's future commercial performance.

140. Analysts immediately focused on whether the safety concerns raised by Scorpion had impaired Vykat's commercial trajectory. Piper Sandler asked whether the slowdown reflected "***hesitation among patients***" following the Report and when Soleno would know that it had emerged from the resulting "***fear or worry by this report***." TD Cowen similarly pressed whether the disruption was dissipating in the fourth quarter, prompting Bhatnagar to concede that October remained "***somewhat similar***" to September.

141. The market reaction was immediate. In response to the November 4 disclosures, Soleno's stock price fell $16.98 per share, or nearly 27%, in a single trading day, from $63.85 at the close on November 4 to $46.87 at the close on November 5, on unusually heavy trading volume—erasing over $900 million in market capitalization.

### J. Post-Class-Period Developments Confirm The Efficacy, Safety, And Commercial Problems Soleno Faced During The Class Period

142. Events following the end of the Class Period further corroborated the efficacy, safety, and commercial problems revealed during the Class Period. These subsequent developments provide powerful confirmation of conditions already identified during the Class Period—including by Soleno's own trial investigators and former employees—and, in the case of the European regulatory review of Vykat discussed in detail below, concern the very same clinical data that existed before the Class Period began.

#### 1. Vykat's Commercial Performance Continues To Deteriorate, Soleno Is Ultimately Sold At A Deep Discount, And Neurocrine's Own Due Diligence Assumed Far Greater Patient Attrition

143. The commercial problems disclosed at the end of the Class Period were never resolved. On November 12, 2025, Bhatnagar told investors that Soleno expected Vykat eventually

to reach "about a 15% discontinuation rate." The commercial picture deteriorated further on December 4, 2025, when Defendants disclosed that even the 764 "active patients" reported at the end of the Class Period included patients receiving Vykat without charge. Mackaness cautioned that "***within that active patient number, you got to remember that a portion of that is free and a portion of it is paid***." Bhatnagar explained that the free-drug population included patients "***who we have assessed that they will never meet the criteria for getting reimbursed by anyone***," and stated that free-drug utilization in rare-disease launches could approach approximately 20%. The disclosure also stood in tension with Manning's statement only one month earlier that "***all of the 764 have claims that are being reimbursed***."

144. By February 2026, Soleno disclosed that adverse-event discontinuations had reached approximately 12% and total discontinuations approximately 15% and increased its longer-term expectation for total patient discontinuations to approximately 15% to 20%. At the same time, Soleno announced that it would stop reporting patient start forms and again declined to provide revenue guidance. These developments were consistent with the persistence problems identified during the Class Period.

145. Independent physician research likewise raised doubts about Vykat's real-world utility. On April 1, 2026, Wells Fargo reported that the leading PWS specialists it surveyed described "***limited PWS use and variable persistence***," clinical benefits that were "***mild-to-moderate after 4–6 months, with no near-term BMI impact***," and safety and monitoring burdens—including edema and cardiac risk—that constrained prescribing. One PWS specialist with approximately half of his patients on Vykat believed most could ultimately discontinue, while another had already experienced early discontinuations because of limited efficacy. Several months later, Deutsche Bank reported that its own calls with endocrinologists likewise identified "***safety/tolerability issues with glucose dysregulation and peripheral edema***" that were affecting physicians' willingness to prescribe Vykat.

146. On April 6, 2026, Neurocrine Biosciences announced that it would acquire Soleno for $53.00 per share in cash, valuing the Company at approximately $2.9 billion. The price was ***approximately 38% below the $85 per share at which Soleno had sold stock to investors only***

***nine months earlier*** and brought to fruition the sale process Soleno had begun within weeks of Vykat's approval. Analysts were surprised by the depressed valuation: Stifel stated that it was "***admittedly surprised***" that Soleno "***sold at this price***," while Wells Fargo observed that the "***price seems low***" and attributed the discounted valuation in part to the potential long-term revenue impact of Vykat's discontinuations and adverse events.

147. Significantly, Neurocrine's subsequent disclosures revealed what its diligence regarding Soleno's own patient data had shown. Neurocrine completed the acquisition assuming an approximately ***25% discontinuation rate***—substantially above the rates Soleno management had been projecting only months earlier. Neurocrine management subsequently stated that it expected discontinuations ultimately to settle in the ***25% to 30%*** range, and analysts reported that Neurocrine believed Soleno had been overly "bullish" about Vykat's discontinuation rate.

148. Finding a willing buyer—a process they had undertaken only days after Vykat was approved—enabled Defendants to fully cash out all their remaining shares of Soleno stock. Bhatnagar and Mackaness entered into agreements committing their shares to the transaction, and upon the May 18, 2026 closing, the Individual Defendants' remaining equity interests were monetized and Soleno's executive officers and directors resigned. In addition to the tens of millions of dollars Bhatnagar, Mackaness, and Manning had already realized through their March 2025 stock sales, the transaction triggered roughly ***$23 million in aggregate change-in-control payments*** to the three Individual Defendants—approximately $15 million to Bhatnagar, $4.2 million to Mackaness, and $3.8 million to Manning.

#### 2. After Reviewing The Same Core Clinical Evidence That Defendants Publicly Touted During The Class Period, The European Medicines Agency Concluded That Vykat Could Not Be Authorized In Europe

149. One of the most significant post-Class-Period confirmations of the deficiencies in Vykat's efficacy evidence came from Europe's independent regulator. Soleno sought authorization from the European Medicines Agency ("EMA") to market Vykat—under the European brand name Viokat—for the same indication for which Defendants had told U.S. investors that efficacy had already been "established" through an "adequate and well-controlled," "randomized, double-

blind, placebo-controlled" clinical program. The EMA is the agency of the European Union responsible for the scientific evaluation, supervision, and safety monitoring of medicines across member states, and is the functional equivalent of the FDA in Europe. The EMA reviewed the same two principal studies underlying Soleno's representations: Soleno's failed Phase 3 placebo-controlled study and the subsequent randomized withdrawal study.

150. The European review did not validate Defendants' characterization of that evidence. To the contrary, after evaluating Soleno's application, submitting questions to the Company, and receiving Soleno's responses, the EMA reached a ***provisional conclusion that Viokat could not be authorized in Europe***. Tellingly, before the EMA completed its assessment of Soleno's latest responses, Soleno withdrew the application on April 6, 2026. The EMA subsequently made clear what had occurred: "***at the time of the withdrawal, the Agency had concerns and its provisional opinion was that Viokat could not have been authorised***" in Europe for the treatment of hyperphagia in patients with PWS.

151. Soleno's withdrawal of its European application was not the product of an unrelated change in corporate strategy. According to the EMA, Soleno itself stated in its withdrawal letter that its decision followed the Agency's preliminary assessment that ***the data Soleno had submitted was insufficient to determine that Vykat's benefits outweighed its risks***. Thus, although the application was withdrawn before a formal final rejection issued, the regulatory reality was clear: the Agency had concluded that Vykat ***could not be authorized*** on the evidence Soleno had submitted, and Soleno withdrew its application following that assessment.

152. The reasons given by the EMA closely tracked the central weaknesses in Vykat's efficacy evidence that had been exposed during the Class Period. Indeed, the EMA emphasized that Soleno's conventional Phase 3 study of 127 patients ***failed to meet its primary endpoint***. Defendants had disclosed that failure, but repeatedly minimized its significance to investors by emphasizing secondary analyses and, ultimately, the subsequent withdrawal study as establishing Vykat's efficacy.

153. Moreover, although the withdrawal study met its primary endpoint, the EMA concluded that its patient population was "***highly selected***." The 77 patients randomized in that

study were not treatment-naïve or representative PWS patients beginning Vykat. They had completed the earlier study and then received Vykat during a prolonged open-label period before entering the withdrawal study—on average, approximately ***3.3 years of prior Vykat exposure***. The EMA further identified concerns with "***the design of the study***" and concluded that the resulting data was "***insufficient to demonstrate the effectiveness of the medicine***." Ultimately, the Agency stated that "***the benefit of Viokat could not be established***."

154. The significance of the EMA's conclusion is difficult to overstate. Throughout the Class Period, Defendants repeatedly assured U.S. investors that Vykat's efficacy had been "established," that the withdrawal study provided compelling evidence that the drug "really does work," and that the clinical package supporting approval was "comprehensive." Scorpion subsequently revealed that the withdrawal study was functionally unblinded, depended on a subjective caregiver endpoint, involved an unusually concentrated and selected patient population, and produced results that even Soleno personnel and participating investigators questioned. Months later, an independent regulator reviewing the same core clinical evidence reached its own conclusion: ***the conventional Phase 3 study had failed, the withdrawal population was highly selected, the study design was concerning, and the evidence was insufficient to demonstrate efficacy***. On that record, Vykat could not be authorized in Europe.

### 3. Leading PWS Experts Publicly Warn About The Same Safety Problems Scorpion Had Exposed, And A Prominent Critic Concedes Scorpion Was Right

155. Post-Class-Period developments also dramatically corroborated Scorpion's safety findings. On August 11, 2026—less than eighteen months after Vykat reached the market—three leading PWS organizations issued an extraordinary joint statement explicitly warning physicians, patients, and caregivers concerning serious adverse events reported in patients receiving Vykat. The statement was signed by seven leading PWS experts, including ***three physician-investigators who had participated in the very clinical trials used to secure Vykat's approval***, as well as physicians who had served as paid consultants or speakers for Soleno or Neurocrine.

156. By that point, seven patients prescribed Vykat had died and more than 100 serious adverse events had been reported to the FDA—predominantly hospitalizations involving ***swelling,***

***respiratory complications, and cardiac problems***. Those were the same categories of serious injury that Scorpion had identified one year earlier through interviews with Soleno's trial investigators and former employees and through caregiver reports concerning commercial patients. The experts explained that the purpose of their statement was to "***increase awareness of the risks for people with PWS when starting Vykat XR***."

157. The statement also directly undermined Defendants' repeated suggestion that severe events observed among Vykat patients could simply be attributed to the serious underlying comorbidities common in PWS. The experts observed that the deaths and complications appearing in FDA reports concerning Vykat patients "***do not appear to be common among individuals providing medical information***" to established PWS registries. According to an expert interviewed by STAT who was described as familiar with the circumstances leading to the statement, the experts had come together because they were "***alarmed by the rising numbers of deaths and serious adverse event cases***" and were concerned that the PWS community was not being "***adequately informed by Neurocrine or the FDA about Vykat's potential safety risks***."

158. STAT highlighted one such case in particular. An FDA case report obtained by STAT concerned a 22-year-old man who, within weeks of starting Vykat, developed swollen eyes, severe congestion, fever, rising blood-glucose levels, and swelling of his feet and ankles. According to his mother and caregiver, the symptoms worsened and the drug was not effective. Although he ultimately stopped taking Vykat, he later died "***suddenly/unexpectedly***" from severe swelling of the epiglottis that obstructed his windpipe, pulmonary edema, and cardiac arrest. While the report did not establish that Vykat caused his death, the constellation of fluid-retention, metabolic, respiratory, and cardiac complications closely mirrored the serious safety problems Scorpion had documented during the Class Period.

159. Further, the significance of the experts' warning was particularly striking because several of its signatories had helped generate the evidence on which Vykat was approved, while others had financial relationships with Soleno or Neurocrine. These were not short sellers. They were members of the PWS medical community—including Soleno's own former trial

investigators—publicly warning patients and physicians about substantially the same safety problems that Defendants had dismissed when Scorpion raised them during the Class Period.

160. The reversal was so significant that Adam Feuerstein, STAT's senior biotech journalist, who had interviewed Defendant Bhatnagar in August 2025 and publicly sided with Soleno after the Scorpion Report, revisited his own reporting. Feuerstein observed that Scorpion had accused Soleno of underreporting serious side effects involving "***the same types of severe swelling, respiratory, and heart issues***" about which the PWS experts were now publicly warning. In August 2025, Feuerstein had written that, although he respected Scorpion founder Kir Kahlon's investigative abilities, he believed Kahlon was "***off base***" concerning Soleno. After the PWS experts issued their August 2026 warning, Feuerstein publicly retracted that assessment: "***Knowing what I know now, I wish I could retract that statement. Kahlon was definitely more right about Vykat. I was wrong.***"

161. These subsequent developments provided powerful independent corroboration of what had already been revealed during the Class Period. Scorpion's central allegations did not depend on speculation about events that arose months later: they came from Soleno's own trial investigators, former employees, treating physicians, and contemporaneous commercial-patient reports. The subsequent EMA assessment independently corroborated the fundamental deficiencies in Vykat's efficacy evidence, while the extraordinary warning issued by leading members of the PWS medical community corroborated the serious safety concerns Scorpion had exposed during the Class Period—in several instances through the ***very same physicians who had participated in Soleno's trials***.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

162. Throughout the Class Period, Defendants made materially false and misleading statements and omitted material facts concerning the subjects central to Soleno's value—Vykat's efficacy, safety, and commercial prospects. As detailed below, these statements presented investors with a materially misleading picture of Vykat and Soleno's business, causing Soleno common stock to trade at artificially inflated and/or maintained prices during the Class Period.

### A. March 26, 2025 Press Release and Special Call

163. On March 26, 2025, Soleno issued a press release announcing FDA approval of Vykat for the treatment of hyperphagia in adults and children four years of age and older with PWS. Soleno stated that the approval was based on "an adequate and well-controlled study and safety data from the comprehensive clinical development program." The Company further represented that Vykat's efficacy had been "established" in a Phase 3 "multi-center, randomized, ***double-blind, placebo-controlled trial***," in which "***[i]ndividuals randomized to switch to placebo demonstrated a statistically significant worsening of hyperphagia*** compared with individuals who remained on VYKAT XR."

164. During a special investor call that same day, Defendant Bhatnagar likewise emphasized the strength of the evidence supporting approval, stating that Vykat's approval was "based on a comprehensive data package that includes statistically significant data from a Phase 3 study," which "***show[ed] that patients in placebo had significantly more hyperphagia than those on VYKAT XR in a randomized withdrawal study***."

165. Defendant Manning similarly highlighted that Vykat's efficacy data supported pricing of Vykat, stating, "***given the robust clinical data supporting VYKAT XR as a treatment that significantly impacts hyperphagia***, we believe we have a strong value proposition."

166. The statements in ¶¶163-65 were materially false and misleading and omitted material facts. Defendants represented that Vykat's efficacy had been "established" in a "double-blind, placebo-controlled" withdrawal study and portrayed that study as reliable proof that Vykat significantly reduced hyperphagia. In reality, as detailed above at ¶¶75-80, the study was ***functionally unblinded***. Vykat produced readily observable effects—including excess hair growth and edema—and had a distinctive odor that the placebo lacked, allowing caregivers and investigators to infer treatment assignment. Ex-Employee #1, who held a key role in Soleno's clinical program, stated that "***just from the side effects, it's pretty clear whether you're on active drug or not***" and that "***if you are smelling it, you could tell the difference between active and placebo***." Soleno's own investigators independently confirmed the same problem: one stated that "***the message went around, and people could tell that it was the active drug***," while another

explained that because of the hair growth and edema "***you'll never be able to blind that properly***" and reported that his site correctly identified which patient had received active drug. Most significantly, Ex-Employee #1 confirmed that this was a concern raised inside Soleno during the trial: "***It's something that many of us who were working on the trial raised and felt was valid***."

167. This failure was particularly material because the withdrawal study's primary efficacy endpoint was not an objective physiological measurement. It depended on the HQ-CT, a subjective questionnaire completed by the same parents and caregivers who could infer whether their children remained on Vykat or had been switched to placebo. Soleno's own investigators described the HQ-CT as "***not a great marker***," a "***subjective score***" that varied depending upon which caregiver completed it, and an instrument that "***it is possible to manipulate***." Scorpion further revealed evidence that caregivers actually understood and manipulated the questionnaire: families appeared to know the score required for trial eligibility, with one investigator observing patient after patient presenting at precisely the qualifying score—"***13, 13, 13***"—and attributing the pattern to families communicating through social media. Thus, Defendants omitted that the supposedly rigorous "double-blind" result depended upon subjective assessments by caregivers who could identify treatment assignment and whose scoring investigators themselves regarded as susceptible to manipulation.

168. Additional undisclosed facts further undermined Defendants' characterization of the clinical evidence as "robust" and having "established" efficacy. Two investigator sites accounted for as much as approximately 40% of the 77 patients in the pivotal withdrawal study, and former Soleno personnel questioned the objectivity of the study's largest enroller, stating that she "***really skewed the data***" and lacked "***academic objectivity***." Soleno personnel were themselves surprised by the unusually rapid and extreme deterioration reported after patients were switched to placebo—one former employee stated that personnel were "***surprised to see that it was so extreme, especially given the fact that it seemed to happen so quickly***"—and questioned the reliability of a result based on data that was largely subjective. Yet Defendants did not disclose any of these concerns when telling investors that the withdrawal study established that Vykat significantly improved hyperphagia.

169. The firsthand experience of Soleno's own trial investigators further contradicted Defendants' portrayal of the clinical data as demonstrating a meaningful treatment effect. Physicians who had enrolled and evaluated the patients underlying Soleno's efficacy claims—including co-authors on Soleno's own publications—repeatedly reported that they observed little or no meaningful benefit. One stated flatly, "***I just didn't think it worked***," and reported that he saw neither "$500,000 worth of" nor even "$5,000 worth of benefit." Another stated, "***to be frank, my feeling was I don't think anyone improved***." A third reported that all of his patients discontinued because "***they just didn't see any benefit***." These were not outside critics evaluating Soleno's publications after the fact; they were physicians who had administered Vykat and generated the very clinical data Defendants were citing as proof that the drug worked.

170. Moreover, it was misleading to tout the withdrawal study as having "established" Vykat's efficacy, and to characterize the supporting data as "robust," in light of what the FDA itself said about that same data. As alleged above at ¶¶43-45, the FDA's internal review—communicated to Defendants before the Class Period, but not public until nearly six months after the Class Period ended—found that the failure of Soleno's conventional Phase 3 trial "creates uncertainty about the treatment effect on hyperphagia"; that neither of the withdrawal study's two secondary measures was positive; that the study involved a small and varied group of patients whose apparent benefit in Soleno's trials could have reflected factors other than Vykat itself, including "decreases in environmental restrictions and potential learning effects over the course of extended open-label treatment"; and that the study therefore required additional evidence confirming that Vykat actually produced the treatment effect. The agency further cautioned that the body-composition and metabolic data Soleno relied upon were not established measures of improvement in hyperphagia, were "not sufficient to conclude that diazoxide choline leads to clinically meaningful reductions in weight or BMI," and did not establish how Vykat reduced hyperphagia. The FDA approved Vykat notwithstanding those acknowledged limitations only by expressly invoking "regulatory flexibility," citing "the rare disease context, and the lack of approved pharmacologic treatments for hyperphagia." Defendants—who knew the agency's

assessment through the review process—told investors the evidence was conclusive while the regulator's documented reservations remained undisclosed.

171. For the same reasons, Defendants' repeated reliance on the withdrawal study's "statistically significant" result was materially misleading. The reported statistical separation between treatment groups did not itself disclose whether that separation reflected a genuine pharmacologic effect. Because the endpoint consisted of subjective caregiver assessments, the blind could readily be penetrated, and the study involved only 77 patients, undisclosed bias in even a relatively small number of assessments could materially affect the observed difference between groups. Defendants nevertheless presented the statistical result as compelling proof that Vykat "significantly impacts hyperphagia" without disclosing the known facts that materially undermined the reliability of that inference. And further, as alleged above at ¶43, the agency found that the withdrawal study involved a small and varied patient group, that neither of its two secondary measures was positive, that the apparent benefit in Soleno's trials could have reflected factors other than Vykat—including "decreases in environmental restrictions and potential learning effects over the course of extended open-label treatment"—and that the study accordingly required additional evidence confirming that Vykat actually produced the treatment effect.

172. Defendants' March 26, 2025 statements also represented that Vykat had a favorable and well-established safety profile. In the March 26 press release, Soleno stated that Vykat "***has a well-established safety profile with over four years of data across four double-blind and/or open label studies***." Soleno further stated that the "primary safety analyses are based on Study 1 (Study C601)," and identified the most common adverse reactions occurring in at least 10% of Vykat-treated patients and at least 2% more frequently than placebo as "hypertrichosis, edema, hyperglycemia and rash."

173. During the special investor call that same day, Bhatnagar expressly characterized the FDA-approved label as confirming Vykat's "***favorable safety and tolerability profile***":

> We're pleased with the label we have received. The indication is for the treatment of hyperphagia in adults and pediatric patients 4 years of age and older with PWS, which is consistent with our expectations. ***Our label reflects VYKAT's favorable safety and tolerability profile,*** contains no box warnings, no contraindications for

> diabetes, no exclusion for severity of hyperphagia, and no requirement for a Risk Evaluation and Mitigation Strategy or REMS program. Importantly, the approved label clearly states that VYKAT XR should not be substituted with diazoxide oral suspension because the pharmacokinetic profiles are different.

174. The statements in ¶¶172-73 were materially false and misleading. Specifically, Defendants portrayed Vykat as having a "well-established safety profile with over four years of data" and a "favorable safety and tolerability profile" while omitting material facts concerning the severity and clinical consequences of adverse events that had occurred during that same development program. Although Soleno publicly disclosed hyperglycemia as a known adverse reaction, its aggregate reporting did not reveal that multiple young trial participants had actually developed diabetes while receiving Vykat. A PWS expert involved in Soleno's clinical program who had reviewed the Phase 3 data with the Company reported knowing "***at least two families that dropped out of the Vykat study, and both of their kids got diabetes, and they were not pre-diabetic***." Both patients were in their early twenties and only slightly overweight, developed diabetes within approximately two months of beginning Vykat, and were "***still now struggling with controlling diabetes***" two to three years later. Soleno's publications and label did not disclose those patient-level facts, including the rapid onset of diabetes in patients who were not previously pre-diabetic or its persistence after Vykat was discontinued.

175. Defendants likewise failed to disclose the severity of serious fluid-retention and cardiac complications that had occurred during the clinical program. Soleno's public materials reported serious adverse events using generalized terms such as "peripheral/pulmonary edema" and "fluid retention." But a former Soleno employee who held a key role in the clinical-trial program reported that two young patients had been hospitalized for serious fluid-overload or cardiac events, including one patient admitted to Massachusetts General Hospital "***for fluid overload and potential heart failure***." According to the former employee, the affected patients did not have "***significant underlying cardiac disease or renal disease***" that readily explained those events. Defendants did not disclose those clinical details when representing that more than four years of trial experience had established Vykat's favorable safety profile. Nor did they disclose

that former Soleno personnel and investigators later reported pressure within the Company to minimize adverse events and avoid attributing them to Vykat.

176. And moreover, it was misleading to describe a purportedly "favorable safety and tolerability" profile while omitting the FDA's expressed safety concerns requiring enhanced pharmacovigilance.

### B. Q1 2025 Earnings Release And Conference Call

177. On May 7, 2025, Soleno issued a press release announcing its financial results for the first quarter of 2025, which it filed with the SEC on Form 8-K, and held a conference call with analysts that same day. During the call, Defendant Bhatnagar again invoked the absence of regulatory restrictions as evidence of Vykat's favorable safety profile, stating:

> ***We believe that our label reflects Vykat XR's favorable safety and tolerability profile,*** contains no box warning, no contraindication for diabetes, no exclusions for severity of hyperphagia, or no requirement for a risk evaluation and mitigation strategy or REMS program.

178. The statements in ¶177 were materially false and misleading for substantially the same reasons as Defendants' March 26 representations concerning Vykat's purportedly "favorable safety and tolerability profile." As alleged above, the clinical experience on which Defendants based that characterization included materially more serious safety events than investors had been told. Multiple young trial participants had developed diabetes while receiving Vykat, including two patients who were not previously pre-diabetic who developed diabetes within approximately two months of beginning treatment and continued struggling to control the disease years later. Soleno's aggregate reporting of "hyperglycemia" did not disclose those patient-level outcomes. Likewise, former Soleno personnel reported that young patients had been hospitalized for serious fluid-overload or cardiac events, including one admission for "***fluid overload and potential heart failure***" in a patient without significant underlying cardiac or renal disease. Scorpion's account therefore either supplied the undisclosed clinical details underlying Soleno's publicly reported drug-related fluid-retention events or revealed additional serious events that Soleno had not publicly disclosed. Former Soleno personnel and trial investigators further reported pressure to minimize adverse events and avoid attributing them to Vykat. And although Bhatnagar again

invoked the absence of a REMS as evidence of favorable safety, he did not disclose that the FDA had required enhanced post-marketing pharmacovigilance.

### C. June 4, 2025 Jefferies Healthcare Conference

179. On June 4, 2025, Defendant Bhatnagar presented at the Jefferies Healthcare Conference and characterized the randomized withdrawal data as essentially conclusive proof of Vykat's efficacy. Bhatnagar stated that the results were "***about as convincing an evidence of efficacy as you would expect to see***" and left "***very little argument that this is a drug that really does work***":

> And you see the C602-RWP data where the gray line is showing significant separation from the blue line. So, in those 16 weeks, we saw a statistically very significant worsening of the placebo patients with a P-value of 0.002 and that was the basis for our submission to the FDA. And while we did that, we allowed the patients to go back on drug in a study called C614. And as you see there, we are back to 9.4. So after a year of starting drug, everyone is back. So, this is about ***as convincing an evidence of efficacy as you would expect to see.*** You give the drug, there's an effect. You take the drug away, the effect goes away. You give the drug back, the effect comes back. So, in my mind, ***there's very little argument that this is a drug that really does work.***

180. The statements in ¶179 were materially false and misleading for substantially the same reasons as Defendants' earlier representations concerning Vykat's efficacy, and were particularly misleading because Bhatnagar portrayed the withdrawal study as virtually conclusive proof that Vykat itself caused the reported improvement. Unbeknownst to investors, the FDA had determined that ***the exact opposite was true***: the FDA's internal review found that the failure of Soleno's conventional Phase 3 trial "***creates uncertainty about the treatment effect on hyperphagia***"; emphasized that neither of the withdrawal study's two secondary measures was positive; that the study involved a small and varied group of patients whose apparent benefit in Soleno's trials could have reflected factors other than Vykat itself, including "decreases in environmental restrictions and potential learning effects over the course of extended open-label treatment"; and that the study therefore required additional "confirmatory evidence" that Vykat actually produced the treatment effect. The agency further cautioned that the body-composition and metabolic data Soleno relied upon were not established measures of improvement in

hyperphagia, were "not sufficient to conclude that diazoxide choline leads to clinically meaningful reductions in weight or BMI," and did not establish how Vykat reduced hyperphagia. The FDA approved Vykat notwithstanding those acknowledged limitations only by expressly invoking "regulatory flexibility," citing "the rare disease context, and the lack of approved pharmacologic treatments for hyperphagia."

181. Additionally, contrary to Bhatnagar's assertion that there was "***very little argument that this is a drug that really does work***" and that the data were "***about as convincing an evidence of efficacy as you would expect to see***," the pivotal withdrawal study was functionally unblinded in a manner that materially undermined the reliability of that determination. Vykat produced readily observable effects—including excess hair growth and edema—and had a distinctive odor that the placebo lacked, allowing caregivers and investigators to infer treatment assignment. Ex-Employee #1 stated that "***just from the side effects, it's pretty clear whether you're on active drug or not***" and that "***if you are smelling it, you could tell the difference between active and placebo***." Multiple trial investigators independently confirmed the same problem, including one who stated that "***the message went around, and people could tell that it was the active drug***," and another who explained that because of the hair growth and edema "***you'll never be able to blind that properly***" and reported that his site correctly identified which patient had received active drug.

182. The unblinding problem was especially acute in the withdrawal study because patients who had taken Vykat for years were switched to placebo, causing visible drug effects such as edema and excess hair growth to subside and thereby signaling to caregivers that treatment assignment had changed. Ex-Employee #1 confirmed that Soleno personnel themselves had raised the concern that caregivers' recognition that their children had been taken off Vykat—rather than a genuine loss of therapeutic effect—could have contributed to the reported worsening in hyperphagia: "***It's something that many of us who were working on the trial raised and felt was valid.***" That concern was particularly material because the study's primary efficacy endpoint was the HQ-CT, a subjective caregiver-completed questionnaire. A Soleno trial investigator described the HQ-CT as an instrument that "it is possible to manipulate," and an independent PWS expert described it as "not a great marker" and a "subjective score" that varied depending on which

caregiver completed it. Scorpion further reported evidence that caregivers understood how to manipulate the questionnaire, including families presenting repeatedly at precisely the qualifying score—"***13, 13, 13***"—after communicating with one another about obtaining access to active drug.

183. Other undisclosed facts further contradicted Bhatnagar's portrayal of the data as essentially beyond dispute. Two investigator sites accounted for as much as approximately 40% of the 77 patients randomized in the pivotal withdrawal study, while former Soleno personnel questioned the objectivity of the study's largest enroller, stating that she "***really skewed the data***" and lacked "***academic objectivity***." More significantly, Soleno personnel themselves were surprised by the very withdrawal effect Bhatnagar later presented as obvious causal proof. One former employee reported that personnel were "***surprised to see that it was so extreme, especially given the fact that it seemed to happen so quickly***" after patients came off the drug, and when asked whether Soleno personnel believed the result, responded: "***Well, so much of the data is subjective. It's a subjective opinion***."

184. Similarly, it was misleading for Bhatnagar to tell investors that there was "very little argument" among the physicians who had actually administered Vykat. Trial investigators who enrolled and evaluated the patients underlying Soleno's efficacy claims—including co-authors on Soleno's own publications—repeatedly reported that they observed little or no meaningful benefit. One stated, "***I just didn't think it worked***"; another stated, "***to be frank, my feeling was I don't think anyone improved***"; and a third reported that all of his patients discontinued because "***they just didn't see any benefit***." These were the physicians whose sites generated the clinical evidence Bhatnagar was characterizing as nearly incontrovertible proof that Vykat worked.

185. During the same presentation, Bhatnagar also emphasized Vykat's extensive safety experience and characterized its most common adverse events as generally mild and self-limiting. He stated that Vykat had been "extensively studied," with "440 total person years of experience," and that hypertrichosis, edema, and hyperglycemia were "***typically grade 1/2, typically self-limiting***." Bhatnagar further identified only "***a couple of serious AEs that are more notable***," specifically one case each of erythema multiforme and diabetic ketoacidosis:

> From a safety perspective, which is important, this is a drug that is based on a known parent molecule. So, we have an extensive amount of data available from the trial program where more than 100 patients were treated for more than a year. 440 total person years of experience overall at the time we submitted and more than six years of continuous exposure in many patients, so it's extensively studied.
>
> The safety profile was generally consistent with what has been seen with the parent molecule, although it appears to be more benign in many cases. The most common adverse events to look at are hypertrichosis, which is increase in body hair; edema and hyperglycemia. ***And these are typically grade 1/2, typically self-limiting.*** Sometimes, they'll need a dose adjustment. Sometimes, they'll need a treatment with a drug like an oral antidiabetic. ***We have had a couple of serious AEs that are more notable, are in the label. One is erythema multiforme and the other is DKA, which has happened in one patient each***.

186. The statements in ¶185 were materially false and misleading. Bhatnagar presented Vykat's extensive clinical experience as demonstrating a comparatively benign safety profile and, after describing its principal adverse events as generally mild and self-limiting, identified only "***a couple of serious AEs that are more notable***"—one case each of erythema multiforme and diabetic ketoacidosis. That presentation omitted materially more serious safety events that had occurred during the same clinical program. As alleged above, trial investigators and other physicians reported multiple patients who developed diabetes while receiving Vykat, including two patients who were not previously pre-diabetic who developed diabetes within approximately two months of beginning treatment and continued struggling to control the disease years later. Additionally, former Soleno personnel reported that young trial patients had been hospitalized for serious fluid-overload or cardiac events, including one admission for "***fluid overload and potential heart failure***"—events that were clearly "more notable" serious AEs but that were omitted from Bhatnagar's statements.

187. For the same reasons, Bhatnagar's characterization of edema and hyperglycemia as "***typically grade 1/2, typically self-limiting***" presented a materially incomplete picture of the safety experience Defendants had accumulated. The undisclosed events included fluid-retention complications requiring hospitalization and medical intervention and diabetes that did not resolve when Vykat was discontinued. Those outcomes were materially different in severity and duration from the principally mild, transient adverse-event profile Bhatnagar conveyed to investors.

**D. June 10, 2025 Goldman Sachs Global Healthcare Conference**

188. On June 10, 2025, Soleno presented at the Goldman Sachs Global Healthcare Conference. During the presentation, Defendant Mackaness again emphasized both the strength of Vykat's efficacy data and the breadth of its safety experience. He stated that the randomized withdrawal study had produced "***strongly statistically significant results on the hyperphagia measurement***," and described Soleno as having an "***extensive clinical trial safety database***" in which the most common adverse events were "***typically self-limiting***" and, "***during the entire length of the clinical program, only 2 severe AEs have been reported to date***":

> So we did that in September of 2023, ***we read out strongly statistical significant results on the hyperphagia measurement.*** That's what we used to form the basis for our NDA. . . . We're going to C602, the randomized withdrawal phase. And you see what you'd like to see is those on placebo worsening, going up to 15.7, those on drug staying constant.
>
> ***Regarding the safety profile for DCCR, extensive clinical trial safety database with greater than 100 PWS patients treated for over a year. Safety profile is consistent with the parent molecule diazoxide***. The most common adverse events reported were [hypertrichosis], edema and hyperglycemia, but ***typically self-limiting,*** could do some dose adjustment or a drug holiday and in certain situations, maybe oral antidiabetics for [hyperglycemia]. ***And during the entire length of the clinical program, only 2 severe AEs have been reported to date***.

189. The statements in ¶188 were materially false and misleading. Mackaness's representation that the withdrawal study produced "***strongly statistically significant results on the hyperphagia measurement***" was materially misleading because he presented the numerical result without disclosing facts that materially undermined the reliability of the inference that Vykat itself caused the reported difference. As alleged above, the pivotal withdrawal study was functionally unblinded by Vykat's visible side effects and distinctive odor; its primary endpoint was a subjective caregiver-completed questionnaire that Soleno's own investigators regarded as unreliable and manipulable; two sites accounted for as much as approximately 40% of the study population; former Soleno personnel questioned the objectivity of the largest enroller; and Soleno personnel themselves were surprised by the unusually rapid and extreme deterioration reported after patients were switched to placebo. Multiple physicians who actually conducted Soleno's trials

likewise reported that they observed little or no meaningful benefit in their own patients, including one who stated "***I don't think anyone improved***."

190. Moreover, the FDA's contemporaneous assessment of the same result confirms that the reported statistical significance did not establish that Vykat itself caused the observed difference. As alleged above at ¶43, the agency found that the withdrawal study involved a small and varied patient group, that neither of its two secondary measures was positive, that the apparent benefit in Soleno's trials could have reflected factors other than Vykat—including "decreases in environmental restrictions and potential learning effects over the course of extended open-label treatment"—and that the study accordingly required additional evidence confirming that Vykat actually produced the treatment effect.

191. Mackaness's portrayal of Soleno's "extensive clinical trial safety database" as demonstrating a generally manageable safety profile, emphasizing that edema and hyperglycemia were "***typically self-limiting***" and that "***during the entire length of the clinical program, only 2 severe AEs have been reported to date***" was also materially false and misleading. That presentation omitted materially more serious safety outcomes that had occurred during the same clinical program. As alleged above, former Soleno personnel reported that young trial patients had been hospitalized for serious fluid-overload or cardiac events, including one admission for "***fluid overload and potential heart failure***." Trial investigators and other physicians also reported multiple patients who developed diabetes while receiving Vykat, including two patients who were not previously pre-diabetic and who developed diabetes within approximately two months of starting treatment and continued struggling to control the disease years later.

192. Mackaness's characterization of edema and hyperglycemia as "***typically self-limiting***" was misleading for similar reasons. The undisclosed safety experience included fluid-retention complications requiring hospitalization and medical intervention, as well as diabetes that persisted long after Vykat was discontinued. Those outcomes were materially different in severity and duration from the largely transient and readily manageable adverse-event profile Mackaness conveyed to investors. Moreover, former Soleno personnel and trial investigators reported that

adverse events had been minimized and that investigators faced pressure not to attribute serious events to Vykat.

### E. Q2 2025 Earnings Release And Conference Call

193. On August 6, 2025, Soleno held a conference call to discuss its second-quarter 2025 financial results. During the call, an analyst asked Defendant Bhatnagar about early patient compliance trends. Although Bhatnagar acknowledged that it was "too early to tell" because Soleno had not yet seen substantial data, he nevertheless represented that the data available to the Company showed that "***discontinuation rates are substantially lower than what we saw even in clinical trials***" and stated that Soleno did not "***expect that to change significantly***":

> Question – Ry Forseth [Guggenheim Securities]: Are there any emerging pain points during the patient start form process that you see as addressable in the next couple of quarters? And our second question is, how are early compliance trends tracking?
>
> Answer – Anish Bhatnagar: So it's too early to tell, Ry, because we haven't seen that much data. ***But what I can tell you is that discontinuation rates are substantially lower than what we saw even in clinical trials.*** So as you may remember, in our trials, we've seen very high compliance rates in part because some of the people living with PWS can also have obsessive compulsive tendencies, and they tend to want to stay on drug as well. ***So we don't expect that to change significantly*** and certainly too early to tell from the data.

194. The statements in ¶193 were materially false and misleading. By August 6, Defendants possessed material information that undermined Bhatnagar's reassuring characterization of early persistence trends and his assertion that Soleno did not "expect" them to change significantly. As alleged above, Vykat's clinical program had already produced meaningful discontinuations associated with inadequate efficacy and adverse effects, while Soleno's own trial investigators reported substantial patient attrition and limited willingness to remain on therapy. More importantly, within weeks of commercial launch, newly treated patients were experiencing serious edema, fluid overload, hyperglycemia, and other complications that were already causing patients to interrupt or discontinue Vykat. Several of those events had reached Soleno or its commercial channels before August 6, including a seven-week hospitalization reported directly to Soleno and adverse events reported through PANTHERx. Against that backdrop, presenting the limited early discontinuation data as "***substantially lower than what we saw even in clinical trials***"

and assuring investors that Soleno did not "***expect that to change significantly***" omitted material then-existing facts bearing directly on whether commercial patients would persist on Vykat.

195. Later during the same call, an analyst asked Bhatnagar what Soleno was seeing regarding Vykat's safety based on the real-world experience accumulated since launch. Bhatnagar acknowledged that post-marketing safety surveillance "***relies on reports from caregivers or health care providers***," but nevertheless assured investors that Soleno had "***not seen anything in the post-marketing setting that is different from the clinical trial setting***," that "***there are no new safety signals***," and again that discontinuation rates were "***substantially lower***" than in the clinical trials:

> Question: My first question, I just wanted to get a sense of what you're seeing on safety. You've obviously collected a lot of real-world evidence now.
>
> Answer – Anish Bhatnagar: So on the safety side, as many of you, I'm sure know, monitoring for safety data in the post-marketing setting is quite different from clinical trial settings. So one typically relies on reports from caregivers or health care providers and the patients that you're treating are also often not as controlled and may have more comorbidities, et cetera. So we are pretty early in the launch. But that said, ***I can tell you that we have not seen anything in the post-marketing setting that is different from the clinical trial setting. So there are no new safety signals***. ***And once again, just to reiterate, what we have seen with the discontinuation rates at this time are substantially lower than what we have seen in the clinical trials***.

196. The statements in ¶195 were materially false and misleading. By August 6, Defendants were aware of materially more serious post-marketing safety experience than Bhatnagar disclosed. As detailed above at ¶¶115-18, within weeks of launch commercial patients were experiencing severe manifestations of the same fluid-retention and metabolic risks that had arisen during the clinical program. On June 30, a family stopped Vykat while their child received Lasix for uncontrolled fluid accumulation; after Vykat was restarted, the child regained five pounds of fluid within days and was ultimately taken off the drug. On July 20, the parent of a 25-year-old reported that the patient had been hospitalized with pulmonary edema and potential heart failure, spent four days on oxygen, and was "***instructed by endo to stop vykat asap***." And on July 28, the parent of an eleven-year-old reported that the child had spent seven weeks hospitalized, including one week on a ventilator, "***due to respiratory failure from fluid overload***," and expressly stated that the event had "***been reported to Soleno and the fda***."

197. Other information had likewise reached Soleno's commercial channels before Bhatnagar spoke. On August 3, just three days before the call, the mother of a five-year-old reported increased blood glucose, somnolence, and respiratory problems after the child's dose was increased and stated that she had "***reported it to panther***"—PANTHERx, Soleno's sole specialty pharmacy partner. Soleno's own field representatives were also discussing pulmonary edema, glucose monitoring, the use of diuretics in Vykat patients, and instructions for families to recognize edema. Yet Bhatnagar acknowledged that post-marketing surveillance "***relies on reports from caregivers or health care providers***" and then assured investors that Soleno had "***not seen anything in the post-marketing setting that is different from the clinical trial setting***" and that there were "***no new safety signals***."

198. Bhatnagar's comparison to the clinical trials was independently misleading because Defendants had repeatedly presented those trials as demonstrating Vykat's "well-established" and "favorable" safety profile while omitting the materially more serious safety experience alleged above. Former Soleno personnel reported young trial patients hospitalized for fluid overload and potential heart failure; physicians reported multiple patients developing diabetes on Vykat, including cases that persisted years after discontinuation; and former employees and investigators described pressure to minimize adverse events and avoid attributing serious events to the drug. Thus, telling investors that the emerging commercial experience was merely consistent with the clinical trials did not provide the reassurance it purported to convey: investors had never been given the full picture of the serious safety problems that had occurred in those trials in the first place.

### F. August 21, 2025 Statements To STAT News

199. On August 21, 2025, in response to the Scorpion Report, Defendant Bhatnagar gave an interview to Adam Feuerstein, the senior biotech columnist for STAT News. Bhatnagar defended Vykat's safety profile, telling Feuerstein that Soleno was monitoring "***literally hundreds of patients***" taking the drug. Bhatnagar emphasized that the Company's safety monitoring had not revealed any surprising or worrisome issues that would warrant FDA action. Bhatnagar further stated: "Overall, what we're seeing is consistent with the drug's label":

> Bhatnagar told me, "We take safety seriously, and we fully recognize that once you get into a commercial setting, things will be different."
>
> To date, ***the company's safety monitoring of "literally hundreds of patients" on this drug has not revealed any surprising or worrisome issues that would warrant FDA action***, Bhatnagar emphasized.
>
> "Overall, ***what we're seeing is consistent with the drug's label***," he said.

200. The statements in ¶199 were materially false and misleading. By August 21, Defendants were aware of materially more serious safety information than Bhatnagar's reassuring characterization disclosed. As alleged above, commercial patients had experienced severe fluid-retention and metabolic complications, including hospitalizations for pulmonary edema, respiratory failure, and potential heart failure, while other patients experienced substantial glucose elevations and discontinued Vykat. Several of those events had been reported directly to Soleno or through PANTHERx, and the Scorpion Report had by then placed these events squarely before Defendants and investors. Indeed, ten days before Bhatnagar emphasized Soleno's safety monitoring of "literally hundreds of patients," a 17-year-old patient taking Vykat had died from an apparent pulmonary embolus—an event Soleno would subsequently disclose to investors. Against that backdrop, Bhatnagar's assertion that Soleno's monitoring had revealed no surprising or worrisome issues warranting FDA action, and that "***what we're seeing is consistent with the drug's label***," materially understated the severity and clinical significance of the post-launch safety reality.

201. Subsequent developments further corroborated the significance of the safety problems Scorpion had identified. In August 2026, after seven patient deaths and more than 100 reports of serious adverse events among patients prescribed Vykat, leading PWS organizations and experts issued a public warning intended to "***increase awareness of the risks for people with PWS when starting Vykat XR***." The experts further observed that the reported deaths and complications "***do not appear to be common***" in established PWS registries, undermining the suggestion that the emerging events could simply be dismissed as background manifestations of PWS or its comorbidities. Feuerstein, who had initially been skeptical of Scorpion's conclusions, subsequently wrote: "***Kahlon was definitely more right about Vykat. I was wrong***."

### G. September 3, 2025 Cantor Global Healthcare Conference

202. On September 3, 2025—three weeks after the Scorpion Report—Defendant Bhatnagar presented at the Cantor Global Healthcare Conference. Asked what Soleno was "seeing from a safety side in commercial use" and how that experience compared with the clinical trials, Bhatnagar represented that the adverse events observed in commercial use were "***similar to what we expect from the known side effect profile of the drug***":

> Question – Kristen Kluska [Cantor Fitzgerald]: From a high level, what are you seeing from a safety side in commercial use? How does this compare to the trial experience?
>
> Answer – Anish Bhatnagar***: So the side effects that we see, hyperglycemia related, peripheral edema or fluid retention related are similar to what we expect from the known side effect profile of the drug***. I think the one thing you see that is different in the commercial setting and is no different with our setting is that patients tend to be a lot less controlled, may have more comorbidities than the clinical trials. And also in clinical trials, you're seeing your doctor very often, which is not the case in the commercial setting. So there is potential for these side effects to be more significant in some situations than others.

203. The statement in ¶202 was materially false and misleading. By September 3, the commercial safety experience could not fairly be characterized merely as adverse events "similar to what we expect from the known side effect profile of the drug." As alleged above at ¶132, more than three weeks earlier, a 17-year-old patient taking Vykat had died from an apparent pulmonary embolus, and the corresponding FAERS record identifies August 22, 2025 as the "Latest Manufacturer Received Date"—establishing that Soleno had received information concerning the death before Bhatnagar made the September 3 statements. Moreover, as alleged above at ¶¶115-20, by that time other commercial patients had experienced severe manifestations of Vykat's risks, including pulmonary edema, respiratory failure from fluid overload, potential heart failure, prolonged hospitalizations, and significant glucose abnormalities requiring treatment or discontinuation. Several of those events had been reported directly to Soleno or through its commercial channels, and the Scorpion Report had by then publicly detailed the same pattern. Although Bhatnagar acknowledged that side effects could be "more significant" in commercial patients, he omitted that Soleno was already confronting serious clinical consequences materially

more severe than the benign and manageable safety profile Defendants had repeatedly presented to investors.

### H. September 10, 2025 Press Release Responding To A Reported Patient Death

204. On September 10, 2025, Soleno issued a press release responding to reports of the death of a patient who had taken Vykat. Soleno represented that "***VYKAT XR has a proven safety and efficacy profile***" and had been approved following a "rigorous clinical program." In addressing the reported death, Soleno emphasized the substantial comorbidities and reduced life expectancy associated with PWS, including deaths from cardiac and respiratory events and pulmonary embolism. Soleno further announced that, going forward, it did not intend to comment specifically on adverse-event cases, including deaths, unless an event was both directly related to Vykat and unexpected under the prescribing information:

> ***VYKAT XR has a proven safety and efficacy profile*** and was approved by the FDA following ***a rigorous clinical program***. Like any medication, VYKAT XR should be administered in accordance with its FDA-approved label, which describes anticipated side effects. ***Soleno Therapeutics is committed to reporting all adverse events experienced by individuals who have taken VYKAT XR in accordance with applicable law.*** Prader Willi Syndrome is a disease where patients have significant comorbidities and have a markedly reduced life expectancy due to reasons that can include cardiac or respiratory events as well as others such as pulmonary embolism. The mean age of death reported from a 40-year mortality study in the U.S. was 29.5 ± 15 years (range: 2 months—67 years). Going forward, Soleno does not intend to specifically comment on adverse events cases (including deaths) unless directly related to VYKAT XR use and unexpected per the U.S. Prescribing Information.
>
> The existence of a report in the FAERS database does not establish causation.

205. The statements in ¶204 were materially false and misleading. As alleged above at ¶¶75-85, Vykat's efficacy was not "proven": the pivotal withdrawal study was functionally unblinded, depended on a subjective and manipulable caregiver-completed endpoint, and was subject to significant concerns raised by Soleno's own personnel and trial investigators, several of whom reported observing little or no meaningful benefit in their own patients. Nor was Vykat's safety "proven." Serious diabetes, fluid-overload, cardiac, and other adverse events during development had been omitted, obscured, or minimized in Soleno's public reporting, while by September 10 commercial patients had experienced pulmonary edema, respiratory failure, potential heart failure, prolonged hospitalizations, and significant metabolic complications.

Several of those events had been reported directly to Soleno or through its commercial channels. Against that record, Soleno's categorical representation that Vykat had a "***proven safety and efficacy profile***" materially misrepresented both the reliability of the efficacy evidence and the safety experience then known to the Company.

206. Moreover, it was materially false and misleading to tout Vykat's "rigorous clinical program" as evidence that Vykat's efficacy was "proven" when the FDA had told Soleno otherwise. As alleged above at ¶¶43-46, the FDA approved Vykat despite finding that the failure of the conventional Phase 3 trial "creates uncertainty about the treatment effect on hyperphagia," that the withdrawal study required additional confirming evidence, that there could be alternative explanations for the effects shown in Soleno's trials and that Soleno's supporting data were "not sufficient to conclude that diazoxide choline leads to clinically meaningful reductions in weight or BMI." The agency approved the drug only by expressly invoking "regulatory flexibility," and required "enhanced pharmacovigilance" after approval to continue monitoring the risk of hyperglycemia.

207. Additionally, the following day, September 11, Scorpion challenged Soleno's response, arguing that the Company's reliance on the background risks associated with PWS did not address the reported safety events and citing published research by Soleno's own lead trial investigator concerning an association between edema and thromboembolic complications in PWS patients.

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER – EXCHANGE ACT CLAIMS ONLY

208. *Vykat was Soleno's only commercial product and the foundation of the Company's entire business.* Throughout the Class Period, Vykat was Soleno's sole commercial product and source of product revenue, and the Company's financial condition and business prospects depended entirely on its efficacy, safety, and commercial success. These were not peripheral subjects about which the Individual Defendants could plausibly have remained uninformed. Defendants Bhatnagar, Mackaness, and Manning repeatedly discussed Vykat's clinical data, adverse-event profile, post-marketing safety experience, patient starts, discontinuations,

reimbursement, and commercial trajectory in detailed presentations and analyst calls throughout the Class Period. Their repeated ability to provide investors with detailed, contemporaneous assessments of precisely these matters supports the inference that they had access to, and were monitoring, the underlying information concerning Vykat when they spoke.

209. *The FDA expressly warned Defendants of problems in their efficacy evidence and notified them that it was approving based on "regulatory flexibility" due to the rare and severe nature of PWS and the lack of available treatments*. As set forth further above, in the FDA's internal review (not made public until after the Class Period) the FDA wrote that the failure of Soleno's conventional Phase 3 trial "***creates uncertainty about the treatment effect on hyperphagia***." The FDA also cautioned that the withdrawal study involved a small and varied group of patients and that the apparent benefit in Soleno's trials could have reflected factors other than Vykat itself, including "decreases in environmental restrictions and potential learning effects over the course of extended open-label treatment." The FDA therefore concluded that the withdrawal study required additional "confirmatory evidence" that Vykat actually produced the treatment effect.

210. The agency further cautioned that the body-composition and metabolic data Soleno relied upon were not established measures of improvement in hyperphagia, were "***not sufficient to conclude that diazoxide choline leads to clinically meaningful reductions in weight or BMI***," and did not establish precisely how Vykat reduced hyperphagia. The FDA nonetheless approved the drug, given the severity and rarity of PWS and the absence of any approved drug treatment for hyperphagia, expressly invoking "***regulatory flexibility***," citing "***the rare disease context, and the lack of approved pharmacologic treatments for hyperphagia***." Thus, the FDA expressly warned Defendants of the limitations of Soleno's data even in approving the drug.

211. The FDA likewise did not treat Vykat's safety profile as a closed issue: the agency specifically required "enhanced pharmacovigilance" after approval to continue monitoring the risk of hyperglycemia. The FDA thus put Defendants on notice of serious limitations in both Soleno's safety and efficacy evidence that caused its approval to be qualified.

212. *Defendant Bhatnagar personally co-authored the publications reporting the trial results on which Vykat's approval rested.* Defendant Bhatnagar is listed as the senior author on each of the peer-reviewed publications reporting the results of the studies on which Vykat's approval rested: (i) Jennifer L. Miller et al., Diazoxide Choline Extended-Release Tablet in People With Prader-Willi Syndrome: A Double-Blind, Placebo-Controlled Trial, 108 J. Clinical Endocrinology & Metabolism 1676 (July 2023), which reported the DESTINY PWS Phase 3 results, including that DCCR "did not significantly improve hyperphagia" as measured by the HQ-CT; and (ii) Jennifer L. Miller et al., Diazoxide choline extended-release tablet in people with Prader-Willi syndrome: results from long-term open-label study, 32 Obesity 252 (Feb. 2024), which reported the C601/C602 open-label extension data. The fact that he co-authored these studies supports the inference that he was, at a minimum, on notice of any issues that came up in the trials, such as those reported by Scorpion.

213. *The former employees and investigators Scorpion interviewed described pressure from Soleno management to downplay adverse events*. Ex-Employee #1 stated that he "was extremely uncomfortable with the direction from [redacted] to try and downplay things," that "[t]here was certainly some pressure on all the investigators to downplay the adverse effects," and that "all the people with significant financial incentive were the ones driving this train." Trial Investigator #2, describing his interactions with Defendant Bhatnagar and Soleno co-founder Neil Cowen in connection with his insistence that adverse events be included in the Phase 3 publication, stated that "they represent a company…they're going to look after the interest of the company." Ex-Employee #2 stated that the Phase 3 top-line data was "not compelling," that this was why the employee left the Company, and that "the person [who ran] clinical development also felt the same way." Trial Investigator #3 stated that Soleno was "more secretive than they should have been," presenting investigators only "group data" and withholding feedback on their own participants.

214. *Soleno itself was the reporter for the vast majority of the adverse events in the FAERS database, and reported many in a suspicious manner.* The vast majority of the adverse events in the FAERS database were reported to FAERS by Soleno itself, including nearly all of the hospitalizations and five of the seven deaths, meaning that Soleno was on notice of the events

earlier than the public. Indeed, the FAERS report on the patient death disclosed September 10, 2025 revealed that the patient had died on August 11, 2025, and that Soleno had been notified of the death by no later than August 22, 2025—a full twelve days before Bhatnagar assured investors at a September 3, 2025 conference that adverse events had been "similar to what we expect from the known side effect profile of the drug."

215. Moreover, many of these events were reported in a suspicious manner. First, two of the patient deaths reported by Soleno failed to list any specific event date, instead stating only that the deaths occurred in "2025," thus obscuring whether Soleno was aware of the deaths at the times it made its false and misleading Class Period statements about Vykat's safety. Soleno also did not report these two deaths to FAERS until May and June 2026, respectively, even though they occurred in 2025. Three of the deaths reported by Soleno also suspiciously omitted the patient age (obscuring whether they were truly consistent with the morbidity profile of PWS), and the rest had ages ranging from 10-18 years—all significantly below the mean PWS mortality age of 29.5 years.

216. Additionally, Soleno further obscured three of the seven reported deaths listed in FAERS by reporting only the generic name for the drug (diazoxide choline) rather than Vykat, such that they were difficult to find in the database because they did not come up in a search for Vykat.

217. The FAERS hospitalization data had similarly suspicious problems. Soleno was listed as the reporter for all but two of the 24 hospitalizations listed in FAERS as of August 2026, and many lacked a specific date (stating only "2025"), lacked patient ages, and/or were reported long after the actual event date.

218. The timing of the FAERS submissions was suspicious as well. Scorpion, which continued to track Vykat reports in the database, flagged on or about October 29, 2025 that a "massive dump of adverse event reports" had recently been uploaded to FAERS—83 adverse events in total, 20 of them classified as serious—days before Defendants' November 4, 2025 disclosures. The sudden reporting of a large number of events suggests that Soleno had delayed reporting many of those events to FAERS.

219. *Defendants had instant access to critical metrics.* Defendants' May 7, 2025 1Q 2025 press release makes clear that Defendants had real-time access to nearly up-to-the-minute reports on critical metrics like patient start forms, active patients, and discontinuations. Specifically, on that date, Soleno reported 268 total patient start forms received and 131 unique prescribers "through May 6, 2025"—one day prior to the press release. This meant that, at any given time, Defendants had access to the most up-to-date figures for those metrics and were tracking in real time patient adoption and discontinuation of the drug.

220. *Defendants had motive, and their conduct throughout the Class Period supports a strong inference of scienter*. Defendants' scienter is further supported by their conduct in the weeks and months immediately following Vykat's approval. While publicly portraying Vykat as a highly effective and safe therapy with an enormous commercial opportunity, the Individual Defendants simultaneously pursued multiple avenues to monetize the value created by those representations: they sold more than $42.7 million of their own Soleno shares immediately following approval; Soleno sold approximately $230 million of newly issued shares to investors near the Class Period high; and, within days of approval, the Company was engaged in a confidential process to sell itself—an outcome that would monetize the Individual Defendants' remaining equity interests and trigger millions of dollars in change-in-control payments.

221. *The Individual Defendants' stock sales support scienter.* As detailed above at ¶¶53-55, on March 27, 2025—the first trading day following Vykat's approval—Defendants Bhatnagar, Mackaness, and Manning exercised options to acquire 630,809 Soleno shares and sold every share acquired, generating ***approximately $42.7 million*** in gross proceeds. Significantly, each sold more than one-third of the Soleno shares then available for sale: CEO Bhatnagar sold ***over 40%*** of his available holdings, Manning ***over 40%***, and Mackaness approximately ***36%***. Bhatnagar alone acquired and immediately sold 523,809 shares for approximately $35.3 million; Mackaness and Manning acquired and sold 107,000 shares for approximately $7.4 million. None of the sales was identified as having been made pursuant to a Rule 10b5-1 trading plan. Nothing required the Individual Defendants to monetize those options when they did. Bhatnagar's options did not expire until between 2028 and 2033, Mackaness's until between 2030 and 2033, and Manning's until

2034. Nevertheless, all three exercised long-dated options and sold every resulting share on the same day, immediately after Vykat's approval caused Soleno's stock price to surge. The transactions also represented a sharp departure from their prior trading practices: during the immediately preceding control period of equal length, none of these executives made a discretionary open-market sale. Thus, these were not routine tax-withholding transactions or preprogrammed sales, but contemporaneous decisions by all three Individual Defendants to realize tens of millions of dollars in cash immediately following approval.

222. *The SPO provides additional evidence of motive.* Defendants also took advantage of Soleno's elevated share price to raise substantial capital for the Company. As alleged above at ¶64, on July 10, 2025, Soleno priced the SPO at $85.00 per share, near the Class Period high. After the underwriters exercised their option in full, Soleno sold 2,705,882 shares to investors for approximately $230 million in gross proceeds. The SPO therefore gave Defendants an additional financial incentive to maintain the market's favorable view of Vykat's efficacy, safety, and commercial prospects while the SPO was being marketed and completed.

223. *The undisclosed sale process further supports scienter.* At the same time Defendants were publicly touting Vykat, selling their own shares, and raising capital from public investors, Soleno was privately exploring a sale of the entire Company. As alleged above at ¶¶56-58, the process began almost immediately after Vykat's approval: Soleno received three acquisition proposals in early April 2025, and on May 22, 2025, "Party A" proposed acquiring Soleno for $86 per share. Party A subsequently withdrew after conducting initial due diligence. A second prospective acquirer, "Party B," entered into a confidentiality agreement in July 2025 and later terminated discussions after conducting diligence, specifically citing, among other reasons, "concerns about Soleno's business prospects in Europe" and a desire "to continue to monitor VYKAT XR's commercial launch in the United States."

224. None of the sale process was disclosed during the Class Period, including while Defendants were selling shares in the July offering and publicly describing Vykat as a first-to-market treatment addressing an approximately 10,000-patient U.S. on-label addressable market and a commercial opportunity exceeding $2 billion. The timing and progression of the sale process

are particularly probative when considered with Defendants' other conduct: within days of approval, while Defendants were portraying Vykat's prospects in exceptionally favorable terms, Soleno was already soliciting or evaluating proposals that would permit the Individual Defendants to monetize their remaining interests in the Company. And two prospective acquirers later withdrew after conducting diligence, with Party B expressly identifying concerns about Soleno's European prospects and the need to observe Vykat's U.S. launch further.

225. The Individual Defendants also stood to benefit personally if the sale process succeeded—and ultimately did. When Soleno was eventually acquired by Neurocrine, Bhatnagar received approximately $15 million in change-in-control payments, Mackaness approximately $4.2 million, and Manning approximately $3.8 million—more than $23 million in the aggregate. Those payments were in addition to the proceeds the Individual Defendants had already realized from their March 27 stock sales and the value realized on their remaining Soleno equity.

226. The conduct discussed above is consistent with Defendants having powerful incentives to maintain the market's favorable—and materially incomplete—understanding of Vykat while those transactions were underway.

## VII. LOSS CAUSATION—EXCHANGE ACT CLAIMS ONLY

227. During the Class Period, shares of Soleno's publicly traded common stock traded on the NASDAQ. The market for shares of Soleno common stock was open, well developed, and efficient at all relevant times.

228. Throughout the Class Period, the price of Soleno common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions and/or scheme identified above. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Soleno common stock, by failing to disclose and misrepresenting the adverse facts detailed herein. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times. Defendants' materially false and misleading statements made

during the Class Period resulted in Lead Plaintiff and the other members of the Class purchasing the Company's stock at artificially inflated prices.

229. When information proximately related to Defendants' prior misrepresentations and fraudulent conduct was disclosed and became apparent to the market and/or the concealed risk materialized, the price of Soleno common stock fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Soleno common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. By issuing materially false and misleading statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Soleno's business. Defendants' false and misleading statements and/or scheme had the intended effect and caused Soleno common stock to trade at, and to be maintained at, artificially inflated levels throughout the Class Period.

230. As elaborated below, the truth behind Defendants' misleading statements and omissions and behind their scheme emerged through a series of partial corrective disclosures.

231. First, on August 15, 2025, Scorpion Capital published a 415-page investigative report on Soleno based on more than 30 interviews, including with physicians who had served as investigators in Soleno's own clinical trials and former Soleno employees who had worked on or overseen its clinical trial program. The report revealed, among other things, that the evidence purportedly establishing Vykat's efficacy was unreliable because the pivotal withdrawal study was functionally unblinded and turned on a subjective, manipulable caregiver questionnaire; that serious adverse events had been minimized during the clinical program and were reemerging in commercial patients; and that Vykat's commercial prospects were materially smaller than Defendants had represented. On this news, the price of Soleno common stock declined $9.27 per share, or approximately 12%, over two trading days—from a close of $77.36 per share on August 14, 2025, to a close of $68.09 per share on August 18, 2025—on unusually heavy trading volume.

232. Second, on September 10, 2025, Soleno filed the Form 8-K disclosing that a 17-year-old male patient treated with Vykat had died, partially revealing the severity of the safety risks Defendants had concealed. The 8-K also maintained that Vykat had a "proven safety and efficacy profile" and emphasized the comorbidities of PWS, and simultaneously announced that it

would no longer comment on adverse event cases, including deaths, going forward. On this news, the price of Soleno common stock declined $13.49 per share, or approximately 19%, over two trading days—from a close of $70.21 per share on September 9, 2025, to a close of $56.72 per share on September 11, 2025—including as much as 28% intraday, on unusually heavy trading volume.

233. Third, on November 4, 2025, Soleno reported its financial results for the third quarter of 2025 and disclosed the state of Vykat's launch. Of 1,043 cumulative patient start forms received since approval, only 764 patients were actively taking Vykat as of September 30—a gap of 279; adverse-event-related discontinuations had risen to approximately 8% and total discontinuations to approximately 10%, months after Defendants had assured investors that discontinuation rates were "substantially lower than what we saw even in clinical trials" and were not expected to change significantly; and Bhatnagar identified peripheral edema and hyperglycemia as the adverse events driving those discontinuations. Bhatnagar further admitted a "disruption in our launch trajectory in the wake of a short seller report," and Soleno again declined to provide revenue guidance. On this news, the price of Soleno common stock declined $16.98 per share, or nearly 27%, in a single trading day—from a close of $63.85 per share on November 4, 2025, to a close of $46.87 per share on November 5, 2025—on unusually heavy trading volume, erasing over $900 million in market capitalization.

234. The timing and magnitude of these declines, each of which followed a disclosure of information directly related to Defendants' prior misrepresentations and omissions, demonstrate that the economic losses suffered by Lead Plaintiff and the Class were a direct and proximate result of Defendants' fraudulent conduct, and were not the result of changed market conditions, macroeconomic factors, or other information unrelated to Defendants' fraud.

## VIII. PRESUMPTION OF RELIANCE—EXCHANGE ACT CLAIMS ONLY

235. The market for Soleno stock was open, well developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Soleno common stock traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the

Company's common stock in reliance on the integrity of the market price of Soleno common stock and market information relating to Soleno and have been damaged thereby.

236. At all relevant times, the market for Soleno common stock was an efficient market for the following reasons, among others: (a) Soleno was listed and actively traded on NASDAQ, a highly efficient and automated market; (b) as a regulated issuer, Soleno filed periodic public reports with the SEC and/or NASDAQ; (c) Soleno regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or (d) Soleno was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

237. As a result of the foregoing, the market for Soleno common stock promptly digested current information regarding Soleno from all publicly available sources and reflected such information in Soleno's stock price. Under these circumstances, all purchasers of Soleno stock during the Class Period suffered similar injury through their purchases of stock at artificially inflated prices, and a presumption of reliance applies.

238. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded in Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period misstatements and omissions set forth above, that requirement is satisfied here.

## IX. DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT

239. Plaintiff specifically disavows any allegations or averments of fraud in connection with the claims pleaded under the Securities Act. These claims are based solely on strict liability, negligence, and control-person liability, as applicable, and do not sound in fraud. For purposes of these claims and the allegations in this section, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud, scienter, or intentional or reckless misconduct, and no such allegation pleaded elsewhere in this Complaint is incorporated into this section or into the Counts below asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act.

240. As set forth in the Certification previously filed with the Court (ECF No. 30-1), Lead Plaintiff purchased shares in the SPO and was damaged as a result of those purchases.

241. Lead Plaintiff asserts claims under Sections 11 and 15 of the Securities Act on behalf of itself and a class of all persons or entities who purchased Soleno common stock pursuant or traceable to the SPO, and a claim under Section 12(a)(2) on behalf of purchasers who acquired shares in the SPO from a statutory seller (together, the "Securities Act Class"). The specific Defendants liable under each provision are identified in the Counts below.

### A. The Securities Act Parties

242. Lead Plaintiff Oklahoma Firefighters Pension and Retirement System is a public pension fund established by the State of Oklahoma in 1981 that provides retirement, disability, and survivor benefits to Oklahoma's paid and volunteer firefighters and their beneficiaries, with more than $3.5 billion in assets under management. Oklahoma Firefighters Pension and Retirement System purchased shares of Soleno common stock in the SPO, from an underwriter of the SPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

243. Defendant Soleno is a pharmaceutical company focused on developing therapies for rare diseases and is headquartered in Redwood City, California. Soleno common stock trades on the NASDAQ stock exchange under the ticker symbol "SLNO." Defendant Soleno was the registrant and issuer of the common stock sold in the SPO. In connection with the SPO, Defendant Soleno issued the Offering Documents (defined below) and filed them with the SEC.

244. Defendant Anish Bhatnagar ("Bhatnagar") served as the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Soleno during the Class Period. Defendant Bhatnagar signed the Registration Statement (defined below).

245. Defendant James (a/k/a Jim) Mackaness ("Mackaness") served as the Chief Financial Officer ("CFO") of Soleno during the Class Period. On February 25, 2026, Soleno announced that CFO Mackaness would be retiring by the end of the Company's first quarter of 2026. Defendant Mackaness signed the Registration Statement (defined below).

246. Defendants Bhatnagar and Mackaness are referred to together with respect to their roles in relation to the Securities Act violations alleged herein as the "Securities Act Executive Defendants," and, together with Defendant Soleno, the "Securities Act Defendants."

**B. Soleno's SPO Offering Documents**

247. On or about July 10, 2025, Soleno conducted a secondary public offering (the "SPO") pursuant to a registration statement on Form S-3 filed with the SEC on January 2, 2024 (the "Registration Statement"). In connection with the SPO, Soleno filed a preliminary prospectus supplement on Form 424B5 on July 10, 2025, and a final prospectus supplement on July 11, 2025, which supplemented the prospectus contained in the Registration Statement (together with the preliminary prospectus supplement and final prospectus supplement, the "Prospectus"; and the Prospectus together with the Registration Statement, the "Offering Documents"). Pursuant to the Offering Documents, Soleno offered and sold 2,352,941 shares of common stock at $85.00 per share and granted the underwriters an option to purchase up to an additional 352,941 shares. The underwriters exercised their option in full, and Soleno received about $215.7 million in net proceeds from the SPO.

**C. Soleno's Materially Untrue And Misleading Statements In The Offering Documents And SEC Filing Incorporated By Reference**

248. The Offering Documents described Vykat's clinical development program, including the purportedly "double-blind placebo-controlled" studies. Although they acknowledged that the original Phase 3 trial failed its primary endpoint, they emphasized a subsequent pre-COVID analysis that purportedly "showed statistical significance in the primary, all key secondary

and several other efficacy endpoints," and represented that the later withdrawal study produced "a highly statistically significant difference" in HQ-CT scores compared with placebo:

> DCCR has been evaluated in a Phase 3 study (C601 or DESTINY PWS), a 13-week randomized, ***double-blind placebo-controlled study***, which completed enrollment in January 2020, with 127 randomized participants at 29 sites in the U.S. and United Kingdom (U.K.). Participants who completed treatment in DESTINY PWS and sought continued treatment with DCCR were eligible to receive DCCR in a long-term open-label safety extension study (C602). Top line results from DESTINY PWS were announced in June 2020. Although the trial did not meet its primary endpoint of change from baseline in hyperphagia, significant improvements were observed in two of three key secondary endpoints. In February 2021, we announced analysis limited to data collected before the onset of the COVID-19 pandemic. ***The analysis of the data through March 1, 2020 showed statistical significance in the primary, all key secondary and several other efficacy endpoints***. In September 2021, we announced top line results from the interim one year data from C602 showing statistically significant reduction in hyperphagia and all other PWS behavioral parameters and statistically significant improvements compared to natural history of PWS from the PATH for PWS Study (PfPWS) over a one year treatment period.
>
> ***
>
> In March 2022, we submitted a proposal to add a randomized withdrawal period to Study C602 to obtain additional controlled data requested by the FDA to support approval of an NDA for DCCR. The randomized withdrawal (RW) period of Study C602 was a multi-center, randomized, ***double-blind, placebo-controlled study*** of DCCR in approximately 80 patients with PWS at 17 sites in the U.S. and 5 sites in the U.K. This RW period consisted only of patients currently enrolled in Study C602 and did not enroll any new patients. We announced the initiation of the RW period for Study C602 in October 2022. On September 26, 2023, we issued a press release announcing positive topline results from the RW period to Study C602. We announced that the study had met the primary endpoint and tha***t there was a highly statistically significant difference in the change from baseline in HQ-CT Total Score for DCCR Compared to placebo (p=0.0022)***.

249. The statements in ¶248 were materially false and misleading and omitted material facts. Although the Offering Documents repeatedly described the relevant studies as "double-blind," the studies were functionally unblinded in practice. Vykat produced readily observable effects—including excess hair growth and edema—and had a distinctive odor that the placebo lacked, allowing caregivers and investigators to infer treatment assignment. As described in the Scorpion Report, Ex-Employee #1, who held a key role in Soleno's clinical program, stated that "***just from the side effects, it's pretty clear whether you're on active drug or not***" and that "***if you***

***are smelling it, you could tell the difference between active and placebo***." Soleno's own investigators independently described the same problem: one stated that "***the message went around, and people could tell that it was the active drug***," while another explained that because of the hair growth and edema "***you'll never be able to blind that properly***" and reported that his site correctly identified which patient had received active drug. Ex-Employee #1 further reported that personnel working on the trials had themselves raised the unblinding concern.

250. The failure of the blind was particularly significant because both studies' primary efficacy endpoint depended on the HQ-CT, a subjective questionnaire completed by caregivers rather than an objective physiological measurement. A Soleno trial investigator described the HQ-CT as an instrument that "it is possible to manipulate," and an independent PWS expert described it as "not a great marker" and a "subjective score" that varied depending on which caregiver completed it. Scorpion further reported evidence suggesting that caregivers understood how the questionnaire affected eligibility: one investigator observed patient after patient presenting at precisely the qualifying score—"***13, 13, 13***"—and attributed the pattern to families communicating through social media. Thus, the Offering Documents omitted that the supposedly rigorous "double-blind" result depended on subjective assessments by caregivers who could infer treatment assignment and whose scoring investigators themselves regarded as susceptible to manipulation.

251. The firsthand experience of Soleno's own trial investigators further undermined the Offering Documents' portrayal of the clinical data as demonstrating a meaningful treatment effect. Physicians who enrolled and evaluated the patients underlying Soleno's efficacy claims—including co-authors on Soleno's own publications—reported observing little or no meaningful benefit. One stated, "I just didn't think it worked," and reported that he saw neither "$500,000 worth of" nor even "$5,000 worth of benefit." Another stated, "to be frank, my feeling was I don't think anyone improved." A third reported that all of his patients discontinued because "they just didn't see any benefit." These were physicians who had administered Vykat and generated the clinical data on which the Offering Documents relied.

252. For the same reasons, the Offering Documents' emphasis on "statistical significance" and a "highly statistically significant" result was materially misleading. The reported

numerical separation did not itself establish that the difference reflected a genuine treatment effect. Because the studies were functionally unblinded and the primary endpoint consisted of subjective caregiver assessments, undisclosed bias in even a relatively small number of assessments could materially affect the observed difference between groups. The Offering Documents nevertheless emphasized the statistical result without disclosing facts that materially undermined its reliability as evidence that Vykat itself caused the reported improvement.

253. The Offering Documents also presented Soleno's clinical results without disclosing material reservations the FDA had expressed about whether those results established efficacy. As later-publicized FDA review materials revealed, the agency concluded that the failure of Soleno's conventional Phase 3 trial "***creates uncertainty about the treatment effect on hyperphagia***"; emphasized that neither secondary endpoint in the withdrawal study was positive; that the study's small and heterogeneous population limited assessment of consistency across subgroups; and that the apparent benefit in Soleno's trials could have reflected factors other than Vykat, including "***decreases in environmental restrictions and potential learning effects over the course of extended open-label treatment***." The FDA therefore required confirmatory evidence of the treatment effect. The agency further cautioned that the body-composition and metabolic data relied upon as supporting evidence were not established independent measures of improvement in hyperphagia and were "***not sufficient to conclude that diazoxide choline leads to clinically meaningful reductions in weight or BMI***." Although the FDA ultimately approved Vykat, it expressly invoked "***regulatory flexibility***" in light of "***the rare disease context, and the lack of approved pharmacologic treatments for hyperphagia***." Those detailed FDA assessments were not publicly available when the Offering Documents were issued.

254. On February 28, 2025, Soleno filed its annual report on Form 10-K for the fiscal year ended December 31, 2024 (the "2024 10-K"), which was signed by Defendants Bhatnagar and Mackaness and subsequently incorporated by reference into the Offering Documents. In describing the randomized withdrawal period of Study C602, the 2024 10-K stated that, on September 26, 2023, Soleno had announced "***positive statistically significant results for the primary endpoint***."

255. The statement was materially misleading and omitted material facts. As alleged above at ¶¶249-53, although the withdrawal study produced a statistically significant numerical result, the 2024 10-K did not disclose facts materially undermining the reliability of that result as evidence of Vykat's efficacy, including that the study was functionally unblinded, that its primary endpoint depended on a subjective caregiver-completed questionnaire susceptible to bias and manipulation, and that Soleno personnel and trial investigators had raised substantial concerns regarding the resulting data. Nor did the 2024 10-K disclose the FDA's reservations concerning the efficacy evidence, including its conclusion that the failed conventional Phase 3 trial "***creates uncertainty about the treatment effect on hyperphagia***" and its determination that the withdrawal-study result required confirmatory evidence.

### D. The Offering Documents Failed To Disclose Known Trends And Uncertainties Required By Item 303 Of Regulation S-K

256. Item 303(b)(2)(ii) of Regulation S-K required Soleno to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii). Because the Registration Statement was subject to Item 303's disclosure requirements, Soleno was required to disclose material trends and uncertainties known to it at the time of the SPO that were reasonably likely to affect its sales or revenues.

257. Those requirements were particularly significant for Soleno. Vykat was the Company's only commercial product and sole source of product revenue, and the SPO occurred less than four months after FDA approval and during the earliest stage of Vykat's commercial launch. Soleno's revenues therefore depended directly on whether physicians prescribed Vykat, patients successfully obtained reimbursement and began treatment, and those patients remained on therapy. Soleno internally tracked precisely those metrics—including patient start forms, prescription processing, reimbursement, active patients, and discontinuations—and thus possessed information concerning the actual trajectory of the launch that investors did not.

258. By the time of the SPO, Soleno was also confronting an emerging trend of adverse events that threatened patient persistence and future prescribing. Commercial patients had already

begun experiencing significant fluid-retention and other complications after starting Vykat. On June 14, a parent reported that her child had been hospitalized and taken off the drug. Beginning June 30, another family documented severe fluid accumulation during their child's fifth week on Vykat, suspended treatment while the child received Lasix to remove the excess fluid, and observed the fluid rapidly return when Vykat was restarted. These events were particularly significant because Vykat generated approximately $500,000 in annual revenue per patient only for so long as patients remained on therapy. Serious adverse events requiring treatment interruption or discontinuation therefore presented a known uncertainty reasonably likely to adversely affect both patient persistence and prescribing, and consequently Soleno's sales and revenues.

259. Soleno likewise possessed substantially more information concerning the conversion and persistence of Vykat patients than the topline patient-start figures disclosed to investors revealed. A patient start form did not itself represent a treated or revenue-generating patient: patients still had to obtain payer authorization, begin therapy, and remain on Vykat. Soleno, through its commercial infrastructure and exclusive specialty-pharmacy arrangement, had current information concerning those stages of the process, including which patients had become active, which were receiving reimbursed drug, which were encountering reimbursement obstacles, and which had interrupted or discontinued treatment. To the extent those data reflected material adverse trends in conversion, reimbursement, or persistence, they were reasonably likely to have an unfavorable effect on Vykat revenues and were required to be disclosed rather than obscured by aggregate start-form figures.

260. The Offering Documents also failed to disclose material regulatory uncertainties that remained after Vykat's approval. Although the FDA ultimately approved Vykat, its review concluded that the failure of Soleno's conventional Phase 3 trial "***creates uncertainty about the treatment effect on hyperphagia***"; the agency required additional evidence to confirm the result of the later withdrawal study; and it expressly invoked "***regulatory flexibility***" in light of "***the rare disease context, and the lack of approved pharmacologic treatments for hyperphagia***." The FDA also required enhanced post-marketing pharmacovigilance to monitor Vykat's hyperglycemia risk. Because Vykat was Soleno's only commercial product, unresolved questions concerning the

strength of its efficacy evidence and the emergence of significant post-marketing safety events created known uncertainties reasonably likely to affect physician adoption, patient persistence, and ultimately Soleno's sales and revenues. None of these detailed FDA assessments was publicly available at the time of the SPO.

261. These trends and uncertainties were especially material because Defendants were simultaneously presenting Vykat's launch to investors in strongly positive terms and using that commercial narrative to support the SPO. The Offering Documents did not disclose that serious adverse events were already threatening patient persistence or provide investors with the information Soleno possessed concerning the relationship between reported patient starts and the patients who had actually converted to sustained, revenue-generating therapy.

262. Defendants failed to disclose these known trends and uncertainties in the Offering Documents. Because Vykat was Soleno's only commercial product, adverse trends affecting reimbursement, treatment initiation, or patient persistence bore directly on the Company's only source of product revenue. Their omission therefore rendered the Offering Documents materially incomplete and violated Item 303's affirmative disclosure requirements.

## X. CLASS ACTION ALLEGATIONS

263. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of two classes: (a) all persons or entities that purchased or otherwise acquired shares of Soleno common stock during the Class Period (the "Exchange Act Class"); and (b) the Securities Act Class (defined above) (together with the Exchange Act Class, the "Classes"). Excluded from both Classes are all Defendants, the officers and directors of the Company at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

264. The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of members of each Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are at least hundreds or thousands of members in each proposed Class. Throughout the Class Period, Soleno

common stock actively traded on NASDAQ (an open and efficient market) under the symbol "SLNO." Millions of Soleno shares were traded publicly during the Class Period on NASDAQ. As of February 28, 2025 (the month before the start of the Class Period), the Company had 45,857,291 shares outstanding, and the Company sold more than 2.7 million shares in the SPO. Record owners and other members of the Classes may be identified from records maintained by Soleno or its transfer agent and may be notified of the pendency of this action by mail using a form of notice similar to that customarily used in securities class actions.

265. Plaintiff's claims are typical of the claims of the other members of each Class as all members of each Class were similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

266. Plaintiff will fairly and adequately protect the interests of the members of each Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of either Class.

267. Common questions of law and fact exist as to all members of each Class and predominate over any questions solely affecting individual members of each Class. Among the questions of law and fact common to the Exchange Act Class are:

(a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

(b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Soleno;

(d) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Soleno;

(e) whether the market price of Soleno common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f) the extent to which the members of the Exchange Act Class have sustained damages and the proper measure of damages.

268. Among the questions of law and fact common to all members of the Securities Act Class are:

(a) whether the Securities Act Defendants violated the Securities Act by the acts and omissions as alleged herein;

(b) whether the Offering Documents misrepresented material facts about the business, operations, and prospects of Soleno; and

(c) the extent to which the members of the Securities Act Class have sustained damages and the proper measure of damages.

269. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual members of each Class may be relatively small, the expense and burden of individual litigation make it impossible for members of each Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XI. UNDISCLOSED ADVERSE INFORMATION—EXCHANGE ACT CLAIMS ONLY

270. The market for Soleno's common stock was an open, well developed, and efficient market at all relevant times. As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Soleno's common stock traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and the other members of the Exchange Act Class purchased Soleno's common stock in reliance upon the integrity of the market price of the Company's common stock and market information relating to Soleno and have been damaged thereby.

271. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Soleno's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Soleno's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Exchange Act Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## XII. INAPPLICABILITY OF STATUTORY SAFE HARBOR

272. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made; and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

273. In the alternative, to the extent the statutory safe harbor is determined to apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading and/or the forward-looking statement was authorized or approved by an executive officer of Soleno who knew the statement was false when made.

## XIII. COUNTS AGAINST DEFENDANTS

### COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

274. Plaintiff repeats and realleges the allegations set forth in §§I-VIII, X-XII, as if fully set forth at length herein.

275. Defendants violated Rule 10b-5(b) ("misstatement and omission" liability) and Rule 10b-5(a) and (c) ("scheme" liability under *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71 (2019)). During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Exchange Act Class members, as alleged herein; (b) artificially inflate and maintain the market price of Soleno common stock; and (c) cause Plaintiff and other members of the Exchange Act Class to purchase Soleno stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

276. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit on the purchasers of the Company's securities in an effort to maintain artificially high market prices for Soleno common stock in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

277. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Soleno's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in

acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Soleno's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Soleno and its business, operations, and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit on the purchasers of the Company's common stock during the Class Period.

278. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (c) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (d) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

279. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Soleno's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they

did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

280. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts as set forth above, the market price of Soleno common stock was artificially inflated and/or maintained at artificially inflated levels; and relying directly or indirectly on the false and misleading statements made by Defendants or on the integrity of the market in which the stock trades, and/or in the absence of material adverse information known or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Exchange Act Class purchased Soleno common stock during the Class Period at artificially inflated prices and were damaged thereby.

281. At the time of said misrepresentations and omissions, Plaintiff and other members of the Exchange Act Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Exchange Act Class and the marketplace known of the truth regarding the problems Soleno was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Exchange Act Class would not have purchased their Soleno common stock or, if they had purchased such common stock during the Class Period, would not have done so at the artificially inflated prices they paid.

282. By virtue of the foregoing, Soleno and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

283. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act (Against the Individual Defendants)

284. Plaintiff repeats and realleges the allegations set forth in §§I-VIII, X-XII, as if fully set forth at length herein.

285. The Individual Defendants acted as controlling persons of Soleno within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions within the Company, participation in and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Further, Defendants Bhatnagar and Mackaness signed the Company's January 2, 2024 Registration Statement and the 2024 10-K incorporated into the Offering Documents.

286. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and therefore had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

287. As set forth above, Soleno and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT III

### For Violations of §11 of the Securities Act (Against The Securities Act Defendants)

288. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Class, against the Securities Act Defendants.

289. Plaintiff repeats and realleges the allegations set forth in §§II, IX, X, and XII, and in ¶¶37-46, 69-110, 115-119, 124-126, and 142-161, as if fully set forth at length herein. For the avoidance of doubt, and consistent with ¶239, this Count does not incorporate ¶¶53-58, 111-114, 120-123, 128-141, or 148, and incorporates no allegation for the purpose of alleging fraud, scienter, or intentional or reckless misconduct.

290. This Count does not sound in fraud, and does not incorporate any allegations herein that sound in fraud. Plaintiff does not allege that any of the Securities Act Defendants had scienter or fraudulent intent with respect to the alleged misstatements and omissions in the Offering Documents. To the extent any allegations herein state or imply that a Defendant knew about, was aware of, or disregarded certain facts, these allegations are included solely to allege a "known trend or uncertainty" that was omitted from the Offering Documents under Item 303 of Regulation S-K, and not to allege scienter, fraudulent intent, or recklessness.

291. The Offering Documents for the SPO were inaccurate and misleading, contained untrue statements of material fact, omitted to state other material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

292. Defendant Soleno was the registrant and issuer of the common stock sold in the SPO pursuant to the Offering Documents and is therefore subject to strict liability under § 11 of the Securities Act because the Offering Documents contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading.

293. The Securities Act Executive Defendants, as signatories to the Registration Statement, are among the persons subject to liability under § 11 of the Securities Act because the

Offering Documents contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading.

294. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

295. By reason of the conduct alleged herein, each of these Securities Act Defendants violated, and/or controlled a person who violated, § 11 of the Securities Act.

296. Plaintiff and other members of the Securities Act Class purchased Soleno common stock registered pursuant to the Offering Documents and traceable to the SPO.

297. Plaintiff and other members of the Securities Act Class have sustained damages. The value of Soleno common stock has declined substantially subsequent to and due to Defendants' violations.

298. At the time of their purchases of Soleno common stock, Plaintiff and other members of the Securities Act Class were without knowledge of the facts concerning Defendants' wrongful conduct alleged herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff filed this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this complaint.

**COUNT IV**

**For Violations of §12(a)(2) of the Securities Act**
**(Against The Securities Act Defendants)**

299. This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Securities Act Class, against the Securities Act Defendants.

300. Plaintiff repeats and realleges the allegations set forth in §§II, IX, X, and XII, and in ¶¶37-46, 69-110, 115-119, 124-126, and 142-161, as if fully set forth at length herein. For the avoidance of doubt, and consistent with ¶239, this Count does not incorporate ¶¶53-58, 111-114,

120-123, 128-141, or 148, and incorporates no allegation for the purpose of alleging fraud, scienter, or intentional or reckless misconduct.

301. This Count does not sound in fraud, and does not incorporate any allegations herein that sound in fraud. Plaintiff does not allege that any of the Securities Act Defendants had scienter or fraudulent intent with respect to the alleged misstatements and omissions in the Offering Documents. To the extent any allegations herein state or imply that a Defendant knew about, was aware of, or disregarded certain facts, these allegations are included solely to allege a "known trend or uncertainty" that was omitted from the Offering Documents under Item 303 of Regulation S-K, and not to allege scienter, fraudulent intent, or recklessness.

302. Each of the Securities Act Defendants named in this cause of action was a seller, offeror, or solicitor of purchases of Soleno common stock pursuant to the defective Prospectus that formed part of the Offering Documents. The actions of solicitation by these Defendants include participating in the preparation of the false and misleading Prospectus and marketing the common stock to investors, including members of the Securities Act Class.

303. The Prospectus for the SPO was materially inaccurate and misleading in that it contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading or required to be stated therein.

304. Each of the Securities Act Defendants named in this cause of action owed Lead Plaintiff and other members of the Securities Act Class that purchased Soleno common stock pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements in the Prospectus to ensure that such statements were true and that there was no failure to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of each of the Securities Act Defendants' failure to exercise reasonable care, the Prospectus contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

305. Plaintiff and the members of the Securities Act Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus issued in connection with the SPO at the time they purchased Soleno common stock.

306. The Securities Act Defendants are liable under § 12(a)(2) of the Securities Act because they offered and sold Soleno common stock by means of a Prospectus that included untrue statements of material fact and omitted material facts necessary to make the statements therein not misleading.

307. As a direct and proximate cause of such violations, Plaintiff and the other members of the Securities Act Class who purchased Soleno common stock pursuant to the Prospectus sustained damages. Accordingly, Plaintiff and such Securities Act Class members are entitled to rescission or damages as provided by law.

308. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiff filed this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this complaint.

## COUNT V

### For Violations of §15 of the Securities Act (Against The Securities Act Defendants)

309. This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against the Securities Act Defendants.

310. Plaintiff repeats and realleges the allegations set forth in §§II, IX, X, and XII, and in ¶¶37-46, 69-110, 115-119, 124-126, and 142-161, as if fully set forth at length herein. For the avoidance of doubt, and consistent with ¶239, this Count does not incorporate ¶¶53-58, 111-114, 120-123, 128-141, or 148, and incorporates no allegation for the purpose of alleging fraud, scienter, or intentional or reckless misconduct.

311. The Securities Act Executive Defendants controlled Soleno at the time of the SPO by virtue of their positions as the Company's senior officers and, in Bhatnagar's case, Chairman of the Board, their authority over the content of the Company's SEC filings and public disclosures, and their signatures on the Registration Statement. The Securities Act Executive Defendants each

had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Soleno.

312. Defendant Soleno controlled the Securities Act Executive Defendants and its other officers and employees.

313. Defendant Soleno is liable to Plaintiff and members of the Securities Act Class under §§ 11 and 12(a)(2) of the Securities Act as alleged above, and the Securities Act Executive Defendants are correspondingly liable as controlling persons under § 15 of the Securities Act.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, prays for relief and judgment as follows:

A. Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Classes defined herein;

B. Awarding Plaintiff and the other members of the Classes damages in an amount that may be proven at trial, together with interest thereon, and awarding rescission or rescissory damages to members of the Securities Act Class as provided by law;

C. Awarding Plaintiff and the members of the Classes pre-judgment and post-judgment interest, as well as their reasonable attorneys' and expert witness fees and other costs; and

D. Awarding such other relief as this Court deems appropriate.

## XV. JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 28, 2026

Respectfully submitted,

*/s/ David R. Kaplan*

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker (SBN 241590)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer (*pro hac vice* forthcoming)
Joshua H. Saltzman (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ David R. Kaplan*

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com